# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ENHABIT, INC.; ADVANCED HOMECARE MANAGEMENT, LLC; and ENCOMPASS HEALTH CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>NAUTIC PARTNERS IX, L.P.; NAUTIC PARTNERS, LLC; CHRISTOPHER COREY; VISTRIA FUND III, LP; THE VISTRIA GROUP, LP; DAVID SCHUPPAN; TVG NP HOMECARE TOPCO, LP; and CHRIS A. WALKER,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 2022-0837-LWW |

## MEMORANDUM OPINION

Date Submitted: August 23, 2024
Date Decided: December 2, 2024

Srinivas M. Raju, Matthew D. Perri, Kyle H. Lachmund & Mari Boyle, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; William Savitt, Sarah K. Eddy, Andrew J.H. Cheung, Brittany A. Fish, Daniel B. Listwa & Min K. Lobb, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; Matthew H. Lembke, Zachary Madonia & Savannah Kolodziej, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, Alabama; *Counsel for Plaintiffs Enhabit, Inc., Advanced Homecare Management LLC, and Encompass Health Corporation*

Lewis H. Lazarus, Albert J. Carroll, Barnaby Grzaslewicz & Samuel E. Bashman, MORRIS JAMES LLP, Wilmington, Delaware; John F. Hartmann, Gabor Balassa, Timothy W. Knapp & Britt Cramer, KIRKLAND & ELLIS LLP, Chicago, Illinois;

*Counsel for Defendants Nautic Partners IX, L.P., Nautic Partners, LLC, and Christopher Corey*

Kenneth J. Nachbar, Megan Ward Cascio & Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Bruce Sperling & Eamon P. Kelly, SPERLING & SLATER, LLC, Chicago, Illinois; *Counsel for Defendants Vistria Fund III, LP, The Vistria Group, LP, David Schuppan, TVG NP Homecare Topco, LP, and Chris A. Walker*

**WILL, Vice Chancellor**

Delaware law demands that corporate officers act with the utmost loyalty to the entity they serve. They must avoid advantaging themselves at the corporation's expense. They cannot compete with the corporation or divert corporate opportunities from it without its consent. And they must undertake good faith efforts to advance the corporation's best interests.

The former officers at issue here lost sight of this enduring duty.

April Anthony is the wildly successful founder of Encompass Home Health & Hospice and its former CEO. She became disillusioned after her business was bought by a large public healthcare company. She and two of her fellow officers—Luke James and Chris Walker—secretly partnered with two private equity firms to forge another path.

Anthony first tried to buy back her business. When she failed, she and her partners decided to form a new home health and hospice company instead.

Anthony and her co-venturers identified three acquisition targets to form the base of their enterprise. Their scheme was kept from Encompass. They took opportunities, resources, and information belonging to Encompass to set themselves up for success. After the new company was formed, Anthony induced Encompass employees to join her.

Anthony's private equity partners were active participants in the fiduciaries' misconduct. They undertook stunning efforts to conceal their actions. Documents

1

were exchanged on the golf course or through webs of lawyers. Code names like "Voldemort" referred to Anthony in written correspondence. A sham employee recruitment process was used to create a paper trail. Records showing Anthony's involvement were deleted or scrubbed.

The result of this deceit is VitalCaring Group, which provides home-based healthcare services in the Southern United States and plans to expand nationwide. Anthony is its CEO, James its President, and Walker its CFO. Anthony and the two private equity firms are each one-third partners.

Encompass sued to right these wrongs. After trial, the defendants are liable for breaches of the duty of loyalty or aiding and abetting such breaches. This is an easy call.

The remedy proves more challenging. VitalCaring has yet to turn a profit and there is nothing for it to disgorge.

Still, equity cannot grant the defendants a pass. The private equity firms remain years away from their anticipated exit. They may do so at a considerable profit—as they have in prior investments that initially faltered.

Encompass is entitled to an equitable payment stream from any such future gains. It is also awarded certain mitigation damages and attorneys' fees. To deny it any recovery on these egregious facts would bless a willful campaign of disloyalty.

## I.    FACTUAL BACKGROUND

Unless otherwise noted, the following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1] To the extent that conflicting evidence was presented, I have weighed it and made findings of fact accordingly.

### A.    April Anthony and Encompass Home Health

In 1998, April Anthony founded a Dallas, Texas-based home health and hospice firm called Encompass Home Health & Hospice ("Encompass Home Health").[2] It was her second home health venture. Her first—Liberty Health Services—began as a small business with about 25 employees serving 50 in-home patients.[3] It was sold for $40 million in 1996.[4]

Anthony used the $3 million she made from the Liberty sale to buy 17 struggling Texas home healthcare providers.[5] She combined the companies to form

---

[1] Joint Pre-trial Stipulation and Order (Dkt. 442) ("PTO"). The trial includes 7 days of live testimony from 11 fact and 1 expert witness, 4,112 joint exhibits, and 55 deposition transcripts. Trial testimony is cited as "[Name] Tr." *See* Trial Tr. (Dkts. 465-71). Facts drawn from exhibits jointly submitted by the parties at trial are referred to according to the numbers provided on the parties' joint exhibit list and cited as "JX__" unless otherwise defined. *See* Joint Ex. List (Dkt. 404). Deposition transcripts are cited as "[Name] Dep."

[2] Anthony Tr. 555.

[3] JX 3172 at 4.

[4] *Id.* at 5-6.

[5] *Id.* at 8.

Encompass Home Health.[6] After early struggles, the new business made remarkable strides. Anthony became a driving force in the home healthcare industry.

Today, Anthony is #45 on *Forbes's* list of America's Richest Self-Made Women, tied with Beyonce Knowles.[7]

## B. Encompass Health Corporation

In 2004, Anthony sold a majority interest in Encompass Home Health to private equity firm Cressey & Company at a valuation of $280 million.[8] She also created and spun out a medical records software business called Homecare Homebase, making $422 million by early 2020 from the sales.[9]

Anthony and Cressey sold Encompass Home Health in 2014.[10] By then, the company had grown to about 200 agencies with 140 locations across 13 states and over 5,000 employees.[11] The buyer was HealthSouth Corporation—a Birmingham, Alabama based public company that later changed its name to Encompass Heath Corporation ("EHC").[12]

---

[6] *Id.* at 8.

[7] Forbes,96 *2024 America's Richest Self-Made Women* (May 28, 2024), https://www.forbes.com/self-made-women.

[8] JX 3172 at 9; Anthony Tr. 555.

[9] JX 3172 at 9; Anthony Tr. 556-58.

[10] Anthony Tr. 555.

[11] *Id.* at 556; JX 18 at 1; JX 4003 at 6.

[12] Anthony Tr. 555.

The sale closed on January 2, 2015 for $750 million.[13] At the time, HealthSouth was in the inpatient rehabilitation facilities business.[14] Acquiring Encompass Home Health gave it a second major business line: home health and hospice. That business became housed within a new EHC subsidiary, Encompass Home Health Holdings, Inc.[15] Encompass Home Health Holdings and its subsidiaries conducted business under the name Encompass Home Health & Hospice.[16]

This decision refers to the operating business as Encompass Home Health. The plaintiff entities are referred to collectively as Encompass.

### C. The Post-Closing Business

Anthony received $70 million in proceeds from the sale to HealthSouth and rolled over about $53 million into the acquired entity.[17] She stayed on as Chief Executive Officer of Encompass Home Health.[18] Other members of the prior management team who worked with Anthony also remained, including Luke James

---

[13] PTO ¶ 15 (date of closing); JX 18 (date of closing); Anthony Tr. 561 (sale price).

[14] JX 18; Coltharp Tr. 368.

[15] JX 2505. The main operating subsidiary of Encompass Home Health Holdings was Advanced Homecare Management, LLC. *Id.*; Jacobsmeyer Tr. 28; Anthony Tr. 681.

[16] Anthony Tr. 681; Jacobsmeyer 11; *see also* JX 2505.

[17] Anthony Tr. 561-62.

[18] PTO ¶ 16.

5

as President of Encompass Home Health.[19]  James likewise received rollover equity.[20]

Anthony's and James's involvement was crucial for EHC as it entered the home health and hospice sector.[21]  Anthony and James became key members of EHC's executive team.[22]  Anthony and James were charged with leading EHC's home health and hospice operations, reporting to EHC's board of directors, and sourcing potential acquisition opportunities.[23]

EHC's trust in Anthony and James initially paid off.  Between 2014 and 2021, EHC's home health and hospice business grew from approximately $400 million to $1.1 billion in annual revenues.[24]  EHC made 36 home health and hospice acquisitions at an aggregate price of over $765 million during the same period.[25]

The COVID-19 pandemic caused an exponential surge in demand for in-home healthcare.  By mid-2020, multiples for publicly traded home health and hospice companies "rose from the mid-to-high teens to 25 to 27 times."[26]  Inpatient

---

[19] James Tr. 1021-22; Anthony Tr. 578.

[20] James Tr. 1020; Coltharp Tr. 373.

[21] Coltharp Tr. 375-76.

[22] *Id.*

[23] *Id.* at 375-76, 380-81.

[24] PTO ¶ 17.

[25] JX 3155.

[26] Coltharp Tr. 406.

rehabilitation facilities—EHC's main business—lacked comparable growth.[27] The market thus discounted EHC's combined value, leaving Encompass Home Health undervalued and disadvantaged in making acquisitions.[28]

Anthony grew discontent with EHC.  By spring 2020, she and James had sold the last of their rollover equity back to EHC and exercised their stock appreciation rights.[29]  Anthony made $370 million and James made $45 million.[30]  The two were "ready to move on" from EHC.[31]  As Anthony told *Forbes* for a June 2020 article, she was "contemplating founding a care-management company" focused on end-of-life care.[32]

### D.    Nautic's and Vistria's Interest

About a month after the *Forbes* article was published, Chris Corey—a managing director at the middle-market healthcare private equity firm Nautic Partners, LLC—approached Anthony.[33]  Corey was interested in working with

---

[27] *Id.* at 405.

[28] *Id.* at 508; JX 339 at 6.

[29] Anthony Tr. 677, 682; James Tr. 1021; Coltharp Tr. 374.

[30] Coltharp Tr. 374.

[31] James Tr. 954-55; *see* JX 172; JX 4085 at 1.

[32] JX 3172 at 7.

[33] JX 171; Corey Tr. 1241-42; *see Nautic Partners*, https://nautic.com (last visited Nov. 30, 2024).

Anthony, who he had known for over a decade.[34]  Anthony told Corey about her frustrations with EHC and her desire to "move on."[35]  She said she would be ready to make a "final decision" about a new endeavor after taking "one step": bidding to take Encompass Home Health private.[36]

Anthony and James began collaborating with Nautic on a potential buyout.[37] Nautic first created a financial model using publicly available information.[38]  At Corey's suggestion, Nautic then worked with James "directly on the model" using Zoom "screen shar[ing] so that no info[rmation] [was] distributed."[39]  Anthony and James provided "feedback" to Nautic during four virtual meetings about "key metrics for Encompass Home Health" including its "admissions growth rates,"

---

[34] Corey Tr. 1241-43.

[35] *Id.* at 1242; JX 172 (Corey telling fellow Nautic partners that Anthony was "clearly frustrated with leadership and sounded ready to move on").

[36] Corey Tr. 1243; JX 172 (Corey reporting to Nautic partners that "[t]here was one step [Anthony] would like to take before making [a] final decision that [they] should discuss live"); *see* PTO ¶ 20.

[37] JX 4085 at 2; Corey Tr. 1242-43, 1250.

[38] JX 174; JX 179; James Tr. 1030-32.

[39] JX 181 at 1; *see infra* note 352.

"revenue per episode," "visit[s] per episode," and "cost per visit."[40]  Nautic refined its model based on the information received from Anthony and James.[41]

By September 2020, Anthony had contacted David Schuppan—a Senior Partner at private equity firm The Vistria Group, LP—to discuss her buyback plan.[42] Schuppan had a long history with Anthony and James.  He had been with Cressey while it co-owned Encompass Home Health and previously sat on Encompass Home Health's board.[43]  Anthony had also invested in other Cressey portfolio companies where Schuppan was a director.[44]  Schuppan confirmed that Vistria was "very interested in the opportunity" to work with Anthony and would "be flattered to join the team."[45]  Anthony introduced Schuppan to Corey.[46]

Around this time, Anthony confided in Encompass Home Health's Chief Financial Officer Chris Walker that she was planning a buyout with Nautic.[47]

[40] James Tr. 1032-35; *see also* Corey Tr. 1262-63 (testifying that four meetings with Anthony and James were held to exchange information over screen shares).

[41] Corey Tr. 1266-67; JX 191 at 1 (listing nine adjustments to Nautic's model based on "feedback from April and Luke"); JX 192 at 1 (Nautic noting that its analysis was based on "April/Luke's range" for growth rate guidance); *see also* Anthony Tr. 583-84 (testifying that she and James reviewed and commented on Nautic's model).

[42] Schuppan Tr. 1742-43; *see also* JX 2025.

[43] Anthony Tr. 580; Schuppan Tr. 1596; JX 1998 (James Tex. Dep.) 82; JX 1980 (Anthony Tex. Dep.) 169.

[44] Schuppan Tr. 1596.

[45] JX 205; Schuppan Tr. 1743.

[46] PTO ¶ 21.

[47] Walker Tr. 1449, 1519.

Walker had joined Encompass Home Health in 2019 as Senior Vice President of Finance and became CFO in 2020.[48]

### E. Anthony and James's Initial Proposal

On September 18, 2020, as planned with Nautic and Vistria, Anthony and James met with EHC's Chief Executive Officer Mark Tarr to float their interest in buying a majority of Encompass Home Health.[49] After the meeting, Anthony emailed Tarr to reiterate their proposal.[50] Anthony and James did not tell Tarr that they were working with private equity firms on the buyout.[51]

Tarr forwarded Anthony's email to EHC's CFO Doug Coltharp and updated him about the conversation with Anthony and James.[52] Coltharp then called Anthony to express his concerns with her proposal.[53] Coltharp revealed to Anthony that EHC would be considering a confidential strategic review of its home health

---

[48] PTO ¶¶ 18-19.

[49] *Id.* ¶ 22; James Tr. 1040; Anthony Tr. 577, 682-84; *see also* JX 212; JX 213 (talking points prepared by Nautic for James's use during the meeting with Tarr); Corey Tr. 1244-45 (discussing talking points).

[50] PTO ¶ 22; JX 214; Anthony Tr. 587.

[51] *See* James Tr. 1040; Anthony Tr. 684.

[52] PTO ¶ 23; JX 222; Anthony Tr. 683; Coltharp Tr. 401.

[53] Coltharp Tr. 402-03.

and hospice unit during an October board meeting.[54]  He suggested that she "remain patient to see what developed" before taking further steps.[55]

Anthony told Schuppan about the EHC board's planned strategic review.[56] Over the ensuing weeks, Vistria and Anthony strategized on potential transaction structures.[57]  Schuppan relayed that "various 'options'" included "the 'go big' option, or take private and breakup of [the] whole company."[58]  Anthony responded that she was "good with either option as long as [she] c[ould] get [her] baby back and be free of [EHC management in Birmingham] in the process."[59]

## F.    The Brookdale Bid

EHC continued to explore home health acquisition targets after its strategic review process began.[60]  In November 2020, Anthony submitted a $350-400 million preliminary bid on behalf of EHC for Brookdale Senior Living's home health and hospice business.[61]  She told Nautic and Vistria about the Brookdale bid, and they

---

[54] *Id.* at 403-04.

[55] *Id.*

[56] JX 3189 at 14 (Anthony texting Schuppan on Oct. 14, 2020: "Let's see how things go with the board review next week."); *see* Anthony Tr. 699; Schuppan Vol. I Dep. 231.

[57] *See, e,g.*, JX 3189 at 13-16, 18 (various texts regarding possibly monetization methods, including through an IPO or de-SPAC transaction); JX 267; *see also* PTO ¶¶ 24-26.

[58] JX 3189 at 15 (Oct. 26, 2020 text message from Schuppan to Anthony).

[59] *Id.* at 16; *see* Anthony Tr. 683.

[60] JX 357; Coltharp Tr. 410-11.

[61] Anthony Tr. 732-33.

began to evaluate partnering with EHC to acquire Brookdale.[62]  EHC was not apprised of these discussions.

On Anthony's recommendation, Nautic submitted its own bid for Brookdale in December to access the sales process.[63]  Corey connected with Walker—with Anthony's assistance—beforehand.[64]  In mid-December, shortly after EHC publicly announced its strategic review, Vistria approached EHC about jointly acquiring Brookdale.[65]

Corey sent a Nautic deck to Anthony's husband's personal email modeling a combined leveraged buyout of Encompass Home Health and an acquisition of Brookdale's home health business.[66]  The deck was then forwarded to Walker's personal email, with the subject line changed to "From Mark Anthony" (Anthony's husband).[67]  Anthony sought input from Walker and James to refine the projections using Encompass's information.[68]

---

[62] JX 307 at 2; JX 3197 at 2; JX 461; *see also* Corey Tr. 1291-96.

[63] JX 3197 at 2 (contemporaneous notes reflecting that Nautic made the bid "based on recommendation from April Anthony").

[64] Corey Tr. 1290; Walker Tr. 1505, 1509-11; JX 347 at 2.  Walker checked on whether he had a non-compete before speaking to Corey.  Walker Tr. 1506-09; JX 1116 at 2.

[65] Schuppan Tr. 1600-01; JX 404.

[66] JX 441 at 1, 7; Corey Tr. 1296-97.

[67] JX 441 at 1; *cf.* JX 485.

[68] JX 485; James Tr. 1051; Walker Tr. 1518-22; *cf.* JX 441 at 1.

## G. The Buyout Proposal

EHC passed on Brookdale.[69] With Brookdale out of play, a joint venture with EHC became unlikely. Nautic, Vistria, and Anthony changed tactics and focus on of buying out Encompass.

On January 13, 2021, Nautic, Vistria, and Anthony sent EHC's board a non-binding proposal to acquire a majority interest in Encompass Home Health for $3.6 billion.[70] James and Walker were neither signatories to nor mentioned in the proposal. The proposal explained that it would expire in 30 days.[71]

The proposal cautioned that "April [was] not likely to support an alternative transaction involving the sale of [Encompass Home Health] to another third party or a public offering of the [Encompass Home Health] business in a spin-out transaction."[72] Anthony planned to resign if EHC rejected it.[73]

EHC was surprised.[74] Before receiving the proposal, EHC had no idea that Anthony was partnering with private equity firms on a transaction involving Encompass Home Health. EHC CFO Coltharp felt that Anthony was trying to

---

[69] JX 434 at 1; Coltharp Tr. 425-27.

[70] PTO ¶ 28.

[71] JX 502 at 5.

[72] PTO ¶ 28; JX 502 at 2; *see* Anthony Tr. 713-14.

[73] JX 78 at 24.

[74] *See* Coltharp Tr. 434-35.

13

preempt the EHC strategic review process.[75] Two EHC directors worried that Anthony might have shared confidential company information with Nautic and Vistria.[76] EHC's leaders also wondered whether Walker and James were involved.

When EHC raised these concerns, Anthony's attorney (who also represented Nautic and Vistria) assured it that Anthony would "not share [EHC's] confidential information with Nautic and Vistria" and that Walker had "not been involved in discussions with Nautic and Vistria."[77] The attorney also told EHC that Anthony had "agree[d] not to discuss with Luke James, Chris Walker, or any other employee of [Encompass] the proposal made by April, Nautic and Vistria."[78]

The buyout proposal expired on February 12.[79] EHC never responded to it.[80]

## H. Newco

Meanwhile, Nautic, Vistria, and Anthony began exploring an alternate plan in case their buyout failed. It involved launching a new home health and hospice business that would compete with Encompass.[81] In mid-December 2020, Nautic and Vistria exchanged (and Corey discussed with Anthony) a draft term sheet for

---

[75] *Id.* at 434-35, 536.

[76] *See id.* at 438.

[77] JX 579 at 1-2.

[78] *Id.* at 2.

[79] PTO ¶ 28; *see also* JX 502.

[80] *See* Schuppan Tr. 1604.

[81] *See* JX 172; JX 388.

14

"Newco"—a three-way joint venture "support[ing] the investments in and/or acquisitions of healthcare services and healthcare information and technology businesses."[82]

The draft term sheet contemplated pro rata $250 million investments from each of Nautic, Vistria, and Anthony.[83]  It provided for a "Founding Manager": Anthony.[84]  Since Anthony "really want[ed] to keep the team together," it outlined a 15% management equity incentive plan ("MEIP") for future hires.[85]

While EHC remained unresponsive on the buyout proposal, Nautic, Vistria, and Anthony took steps to advance their partnership.  They began by retaining joint advisors.

In January 2021, Nautic, Vistria, and Anthony retained Vistria's longtime counsel at Ropes & Gray LLP.[86]  According to Schuppan, the joint representation would ensure there was "[n]o formal communication trail with April (amongst us)."[87]  Schuppan emphasized this goal by sending a Ropes attorney a YouTube clip

---

[82] JX 388 at 2.

[83] JX 423 at 2; Corey Tr. 1303.

[84] JX 388 at 2; Corey Tr. 1301.

[85] JX 414 at 1; *see* JX 424 at 1; JX 423 at 2-3.

[86] Schuppan Tr. 1681; Corey Tr. 1231.

[87] JX 471 at 1.

15

of Ari Gold (a character from the television show Entourage) tearing up documents and shouting "never again."[88]

Nautic and Vistria also jointly engaged an investment banker. They chose middle market investment bank Harris Williams to guide their search for platform acquisition targets.[89] Though Anthony was not listed on the official engagement letter, she was closely involved in the selection. She and Harris Williams banker Turner Bredrup had interacted regularly since August 2020.[90] Bredrup had previously worked with Anthony and Schuppan on the sale of Encompass Home Health to EHC in 2014.[91]

## I.    Newco's Potential Acquisition Targets

Harris Williams's initial role was to advise on the EHC buyout proposal.[92] After the Brookdale angle failed and while EHC remained unresponsive to the proposal, Anthony, Schuppan, and Corey became focused on the broader home health and hospice sector.[93] Harris Williams's function likewise shifted to

---

[88] JX 470.

[89] Schuppan Tr. 1605; JX 580; JX 602; JXs 613-14.

[90]  JX 3187.

[91] Anthony Tr. 675; Bredrup Dep. 19-20, 42.

[92] JX 369; Anthony Tr. 746-47.

[93] *See* Anthony Tr. 746-47; Schuppan Tr. 1605-06; JX 329.

16

identifying potential acquisition targets assuming that "plan A"—the buyout—failed.[94]

Due to her expertise, Anthony took the lead on setting the criteria for acquisition targets.[95] She asked Harris Williams for information about transaction multiples for home health and hospice businesses that did not use her Homecare Homebase software platform.[96] This approach created an additional opportunity: Causing the companies to use Homecare Homebase could increase transaction multiples.[97] Anthony also prioritized businesses operating in Texas and Florida—two of the largest states for Medicare beneficiaries.[98]

---

[94] JX 580 (Harris Williams sending Corey a "market map" and writing: "I hope plan A is the path we go down and that works out but we are looking forward to engaging in a conversation with you all about what this [opportunity] set looks like.").

[95] *See* Corey Tr. 1151-52 (testifying that Nautic "didn't want to invest in a business that [Anthony] would be opposed to" and "wanted her opinion on any home health businesses that [they] were going to . . . look at").

[96] JX 329; Anthony Tr. 747.

[97] JX 329; JX 336.

[98] Anthony Tr. 753; James Dep. 197-99.

### 1. Homecare Holdings

Harris Williams's list of potential targets included Homecare Holdings, LLC.[99] This target was not "sourced" by Harris Williams.[100] Harris Williams was running a sale process for Homecare Holdings.[101]

Homecare Holdings was a strong contender for a "platform" asset—a company acquired by a private equity firm that serves as the foundation for future acquisitions of similar businesses.[102] Homecare Holdings operated in Anthony's preferred markets of Florida and Texas.[103] It was also based in Dallas, where Anthony and her management team lived.[104]

On February 3, Schuppan and Anthony had a 35-minute call to "spitball" acquisition ideas.[105] The next day, Schuppan told Corey and Harris Williams that Homecare Holdings "[wa]s a good tbd [to be determined]" option.[106]

---

[99] JX 580 at 11.

[100] JX 3133 at 1.

[101] Schuppan Tr. 1757; JX 799.

[102] *See generally* Bain & Co., "Buy-and-Build: A Powerful PE Strategy, but Hard to Pull Off," https://www.bain.com/insights/buy-and-build-global-private-equity-report-2019/ (last visited Nov. 26, 2024).

[103] JX 631; JX 602.

[104] Anthony Tr. 753-54.

[105] JX 3189 at 29; JX 3215 at 50; Schuppan Tr. 1754-56.

[106] JX 602 at 1 (referring to Homecare Holdings by the name of its CEO). Schuppan's email also noted in that email that one of his "groomsmen is a partner at Edgewater." *Id.* Edgewater is a private equity firm that owned Homecare Holdings. Schuppan Tr. 1757.

### 2. Vital Health Care

Another platform target identified was Louisiana-based Vital Health Care Group. On February 4, Schuppan reached out to a broker in Nashville, Tennessee he had not spoken with for nearly a year.[107] This outreach came just after Schuppan's "spitball[ing]" session with Anthony.[108] Schuppan wanted to discuss Vital, which the broker was representing in a sale process.[109] They planned a meeting in Nashville for early March.[110]

### 3. Kare-in-Home

The third target identified was Missisippi-based company Kare-in-Home, Inc.[111] Anthony had a long history with Kare's owners and "thought highly of their business for many years."[112] In 2018, she and James had considered acquiring Kare for Encompass, but Kare's owners were not ready to sell.[113] That had changed by 2021. Kare's owners hoped to partner with a private equity firm to grow their business.[114]

---

[107] PTO ¶ 33; *see* JX 3215 at 50; Schuppan Tr. 1766-68; Cunningham Tr. 2106-08.

[108] *See supra* note 105.

[109] Schuppan Tr. 1626-28, 1767.

[110] JX 601; JX 606.

[111] JX 692 at 2.

[112] Anthony Tr. 763.

[113] JX 65; JX 53; James Tr. 1005; James Dep. 205-06.

[114] Galyan Dep. 269.

## J.    Newco's Platform Solidifies.

On February 9, 2021, Schuppan, Corey, and Anthony met by Zoom to discuss potential acquisition targets.[115]   Schuppan sent Corey a "private" spreadsheet beforehand that listed targets with comments reflecting the group's views.[116] Homecare Holdings and Vital were included.[117]

The next morning, Schuppan told Harris Williams that Homecare Holdings was "of interest."[118]  Nautic and Vistria were brought into the Homecare Holdings sale process.[119]

Anthony remained in close contact with Nautic and Vistria about the platform acquisitions throughout February and March.[120]  She kept a low profile.[121]   Their discussions took place over the phone or by Zoom.[122]

---

[115] JX 611; Schuppan Tr. 1761-64.

[116] PTO ¶ 36; JX 608; JX 616.

[117] JX 616; Schuppan Tr. 1778-83.

[118] PTO ¶ 37; JX 620.

[119] Schuppan Tr. 1612-13.

[120] JX 78 at 31-39; JX 3190 at 2; JX 3169 at 280-392.

[121] Schuppan Tr. 1612-13, 1710-13.

[122] *See e.g.*, JX 611; JX 781.

Anthony was still the CEO of Encompass Home Health at this point. She did not mention to Encompass the opportunities to acquire Homecare Holdings, Vital, or Kare. Nor did she mention her plan to launch a competing venture.[123]

## K. The Ropes Roadmap

It was not lost on Nautic and Vistria that Anthony's fiduciary duties to Encompass created risks to their plans. They were also concerned about contractual restrictive covenants that would continue to bind Anthony after her employment ended.[124] They asked Ropes for advice on navigating these issues.[125]

On February 24, Ropes sent Corey and Schuppan a memorandum that would "serve as a roadmap for [their] next steps, taking into account practical and legal considerations (as well as recommended protocols) in light of [Anthony's] employment agreement [with EHC]."[126] Anthony was included in the correspondence. The memo gave an overview of Anthony's restrictive covenants, including a one-year non-compete provision and a two-year non-solicitation provision.[127] It also noted that James had "generally identical" obligations."[128]

---

[123] Anthony Tr. 775-80; Jacobsmeyer Tr. 21-24.

[124] JX 108 at 6-7.

[125] Corey Tr. 1230-34.

[126] JX 676 at 1.

[127] *Id.* at 2.

[128] *Id.* at 2 n.2.

Ropes advised that "[a]ny contact between Nautic/Vistria and Luke [James] should be kept separate from discussions with April."[129]

The Ropes memo also provided detailed guidance on how Nautic and Vistria should interact with Anthony to minimize risk. For example, Nautic and Vistria were encouraged to be cautious in describing Anthony's role while engaging with acquisition targets.[130] They were advised to only "mention they ha[d] discussed [the matter] with April" and emphasize that she "would not be an investor or an executive until after her applicable restrictive covenants expire[d]" absent a waiver from Encompass.[131]

As an immediate next step, Vistria and Nautic were counseled to "[p]resent [a] term sheet to April . . . lay[ing] out a plan for future potential collaboration."[132] The term sheet was to address "April's active involvement after the expiration of her applicable restrictive covenants."[133]

The next day, Corey sent Anthony a revised version of their earlier term sheet as advised.[134] It stated that Nautic, Vistria, and Anthony would each invest $250

---

[129] *Id.*

[130] *Id.* at 5.

[131] *Id.*

[132] *Id.*

[133] *Id.* (emphasis in original).

[134] PTO ¶ 41; JX 688; *see also* JX 662.

million in their new venture.[135] It contemplated that Anthony would "become Chairman and Chief Executive Officer of Newco."[136] It also reflected (as in the December version) that a 15% MEIP would be divided among Newco management.[137]

### L. Anthony Resigns and Recruits.

On March 18, 2021, after consulting Nautic and Vistria, Anthony told EHC that she would be resigning effective June 18.[138] She said that she planned to spend time at her homes in Idaho and Cabo and work on her golf game.[139] That was false. Anthony instead continued her efforts to form a home healthcare company with Nautic and Vistria.

Anthony's efforts included recruiting certain Encompass employees for the venture.[140] She used a spreadsheet showing a MEIP allocation of equity worth millions to lure Encompass Home Health employees to Newco.[141]

---

[135] JX 662 at 7.

[136] *Id.* at 7; *see also* Corey Tr. 1305-06; Anthony Tr. 723-24.

[137] JX 688 at 3.

[138] PTO ¶ 43.

[139] Jacobsmeyer Tr. 24.

[140] *See infra* Section II.A.2.a (discussing Anthony's solicitation of Encompass employees).

[141] Jolley Tr. 144-48; *see* JX 722 (spreadsheet metadata showing Anthony saved the file on Mar. 10, 2021).

James and Walker were among those persuaded to leave Encompass for Newco. James had been on board with Anthony's plans since the outset.[142] In time, so was Walker.[143] Walker resigned from Encompass in June 2021 to join Newco in July.[144]

**M.    Topco**

Through the spring, Newco diligenced and negotiated with its three chosen platform acquisition targets: Homecare Holdings, Vital, and Kare.[145] By mid-May, Topco had executed an agreement to buy Homecare Holdings, had a signed letter of intent for Vital, and had submitted a letter of intent to acquire Kare.[146]

Anthony suggested that a "high level Holdco" be formed to facilitate the acquisitions.[147] Vistria and Nautic entities formed Bridgestone Topco, LP ("Topco"), with Corey and Schuppan serving as its managers.[148] On June 7, a letter of intent with Kare was executed.[149]

---

[142] Corey Tr. 1243-1251.

[143] Walker Tr. 1537-42.

[144] PTO ¶¶ 66, 74.

[145] *See, e.g.*, JX 4005; JX 742; Cunningham Tr. 2116-18; JX 605.

[146] PTO ¶¶ 59-60, 67; JX 1113; JX 1059.

[147] JX 974 at 2. Anthony also proposed that the "[N]ewco consortium" split Ropes' legal fees three ways among herself, Nautic, and Vistria. *Id.*

[148] JX 1090 at 1-2.

[149] PTO ¶ 71; JX 1205.

Anthony, James, and Walker remained at Encompass during this time.[150] They did not tell Encompass that these opportunities were on the market. Nor did they consider them for Encompass.[151]

## N. Anthony's Hidden Hand

Despite being Encompass Home Health's CEO, Anthony played a major role in securing each of the platform acquisition targets for Topco.[152] She had frequent Zoom meetings, phone calls, and in-person meetings with Nautic, Vistria, and representatives from the target companies.[153] References to her involvement were scrubbed or replaced with sly codenames.[154]

In April, Schuppan handed a packet of Homecare Holdings diligence materials to Anthony while golfing.[155] She shared them with James and Walker.[156] Later that month, she attended a three-hour meeting in Dallas with Schuppan, Corey, and Nautic's managing partner to discuss Homecare Holdings.[157]

---

[150] *See* JX 790; JX 986; PTO ¶ 66.

[151] Coltharp Tr. 448; Anthony Tr. 775-80; James Tr. 1085-87; Walker Tr. 1554-57.

[152] Anthony Tr. 777-78.

[153] JX 882; JX 1025; JX 966; JX 748 at 35; JX 974 at 2; JX 952; Anthony Tr. 755, 767-68; Corey Tr. 1337, 1341, 1363.

[154] Schuppan Tr. 1695-98; JX 1557 at 2; Corey Dep. 250-56; *see* JX 791; Kuchibhotla Dep. 119-20; *see infra* notes 416 (describing efforts to conceal Anthony's participation with code names like "Voldemort") and accompanying text.

[155] Schuppan Tr. 1699-1700; Anthony Tr. 755-61.

[156] Anthony Tr. 759.

[157] PTO ¶ 53; Anthony Tr. 767-68; Corey Tr. 1363-64.

In May, Anthony met with Nautic's investment committee by Zoom to encourage it to authorize the Homecare Holdings acquisition.[158] Contemporaneous notes of the meeting show that Anthony discussed Homecare Holdings in detail.[159] She told Nautic that she saw value in getting the venture off the ground while she still had Encompass's "access [to] people and relationships."[160] She highlighted the involvement of James and Walker. She emphasized that she "wouldn't be as excited [about Newco] if Luke wasn't coming along" and that Walker could "start sooner" than she and James since he "d[idn']t have a non-compete."[161]

Anthony played a similar role in the Kare and Vital acquisitions. She received diligence materials about Kare and Vital from Ropes.[162] She also met with Kare's CEO to goad him into selling the business to Topco.[163] Anthony, Corey, and Schuppan had ongoing discussions about Kare and Vital throughout the summer, with Anthony providing insights on the targets and negotiation strategy.[164]

---

[158] Anthony Tr. 772-77; Vinciguerra Tr. 886-91; *see* PTO ¶ 59; JX 1025.

[159] JX 748 at 45; Vinciguerra Tr. 830-31, 887-91; *see infra* note 371 (discussing the credibility of Vinciguerra and his handwritten notes).

[160] JX 748 at 45.

[161] *Id.*; Anthony Tr. 774.

[162] PTO ¶ 55; Anthony Tr. 754-55; JX 1083; JX 967.

[163] Anthony Dep. 239-41.

[164] *See, e.g.*, JX 1157; Anthony Tr. 765-66; Corey Tr. 1372-73.

Topco's acquisition of Homecare Holdings closed on July 30 for $192 million.[165] The next month, it acquired Vital for $106 million.[166] The Kare acquisition closed a few months later in December for $110 million.[167] The Homecare Holdings, Vital, and Kare deals were Topco's "Original Acquisitions." Add-on acquisitions were planned to further Topco's "buy-and-build" strategy.[168]

### O. Walker Resigns

Walker left Encompass on June 18, 2021—the same day Anthony's employment ended.[169] Walker had been playing a substantial role in Topco's initial acquisitions.[170] He not only reviewed diligence materials that Nautic and Vistria funneled to Anthony, but also spoke to Homecare Holdings and Vital principals about selling their businesses to Topco.[171]

Like Anthony and James, Walker hid his actions from Encompass. Walker cryptically told Coltharp that he was leaving for "an opportunity that would allow

---

[165] PTO ¶ 76.

[166] *Id.* ¶ 77.

[167] *Id.* ¶ 80.

[168] *See infra* note 514 (re: future M&A projected); *see generally supra* note 102 (discussing "buy-and-build" strategies in private equity M&A).

[169] PTO ¶ 72; Anthony Tr. 633; Walker Tr. 1525.

[170] Anthony Tr. 730; Coltharp Tr. 377-78.

[171] Walker Tr. 1551-54; JX 3099; JX 1162 at 2-3.

him a more operational role."[172] When Coltharp asked Walker where he would be working, Walker—on Anthony's advice—refused to answer.[173]

Unlike Anthony and James, Walker was not subject to a contractual non-compete.[174] He became Topco's acting CEO in July shortly after departing Encompass.[175] But he was CEO in name only. He functioned as Anthony's conduit, passing along her insights and implementing her strategies.[176] He merely held the title on an interim basis until Anthony's non-compete expired.[177]

On June 22, Nautic and Vistria held a strategy session in Dallas to prepare for a meeting with Homecare Holdings management.[178] The email invite suggested that Anthony was not present.[179] In reality, she attended and led discussions.[180] She announced during the meeting that Walker and James would be joining Topco's management team.[181]

---

[172] Coltharp Tr. 445.

[173] *Id.* at 444-45.

[174] JX 1116 at 25-27.

[175] PTO ¶ 74; JX 1112.

[176] Walker Tr. 1566-69.

[177] *Id.* at 1566-67. There was no "contingency plan" for a permanent CEO other than Anthony. *Id.*; Schuppan Tr. 1734-35.

[178] JX 1297.

[179] *Id.*

[180] PTO ¶ 73; Anthony Tr. 798-800, 802-03; Kuchibhotla Dep. 152-53.

[181] Anthony Dep. 222-23.

Although Walker was absent from the Dallas strategy session, he was working with Anthony to launch the new venture. For a week in July, Walker visited Anthony in Idaho to strategize.[182] Walker and Anthony prepared 60- and 90-day business plans for Topco, which Walker sent to Nautic and Vistria.[183]

After his Idaho trip, Walker began executing on the objectives he and Anthony had discussed. He instructed a former Encompass employee, who had joined Topco in July, to implement Anthony's 60- and 90-day priorities.[184] He also worked to recruit more Encompass employees to Topco by touting Topco's lucrative MEIP.[185]

## P.    Jolley's Bravery

Anthony's plans were coming to fruition, save one. For months, she tried to recruit Encompass Home Health's Executive Vice President of Operations Julie Jolley. Anthony told Jolley that James and Walker would be joining the new venture and that she hoped to recruit others, including Encompass Home Health's Executive Vice President of Clinical Services Janice Riggins.[186]

---

[182] Thompson Dep. 55-57; JX 2068 at 720-21, 1225-29.

[183] JX 2050; JX 1443; JX 1449; Walker Tr. 1568-69; JX 2068 at 1229-33; Corey Tr. 1386-87; Ramaker Dep. 138-42; JX 1485; JX 1474; JX 1431; JX 1476; JX 3190 at 3.

[184] Jolley Tr. 184; JX 1492.

[185] JX 1442; JX 2002 at 194-95, 200-08; JX 1989 at 208-12; Jacobsmeyer Tr. 47.

[186] Jolley Tr. 142-43, 163, 198-202; Jacobsmeyer Tr. 39.

Jolley was initially tempted by Anthony's Topco MEIP spreadsheet.[187] Anthony instructed Jolley to wait until June 23 to resign—the same day Encompass's new CEO Barbara Jacobsmeyer was starting.[188] But when the time came, James gave Jolley a cryptic message about restrictive covenants and litigation risk.[189] Jolley interpreted it as a warning not to resign yet.[190]

A few days later, Jolley was instructed to call Anthony's husband's phone using Jolley's husband's phone.[191] Anthony told Jolley that she should wait to resign because "the lawyers were nervous."[192] Corey passed along a similar message to Jolley the same day, urging her to wait.[193]

While Jolley waited for the green light to quit, she had a change of heart.[194] By August, Jolley came to respect Jacobsmeyer and decided to stay at Encompass.[195] She became uncomfortable with Anthony's actions.[196] When another senior Encompass Home Health employee announced her decision to join Topco, Jolley

---

[187] *Id.* at 144-48.

[188] *Id.* at 150.

[189] *Id.* at 173-79; James Tr. 1066-71.

[190] Jolley Tr. 179-81.

[191] *Id.* at 179-80.

[192] *Id.* at 181-82.

[193] Corey Tr. 1390.

[194] Jolley Tr. 170-71; *see infra* note 335 (discussing Jolley's credibility).

[195] *Id.* at 179, 192

[196] *Id.*

revealed Anthony's plan to Jacobsmeyer—including Jolley's part in it.[197] Jacobsmeyer quickly authorized retention packages to prevent further defections.[198]

In September 2021, Encompass sent cease and desist letters to Anthony, Walker, Nautic, Vistria, and others.[199]

## Q.    The Texas Litigation

In October 2021, Encompass sued Anthony in Texas state court for breaching the restrictive covenants in her employment agreement.[200]   After a trial, the court held that Anthony had breached the covenants by "directly solicit[ing] Walker, Jolley, and Riggins"; that "[t]he evidence overwhelmingly establish[ed] that Anthony's actions were . . . affirmative 'engage[ment]' in competition"; and that she "actively advised and consulted with Nautic, Vistria, and Walker, among others, in the business and growth strategies of [VitalCaring]—even while still CEO of Encompass."[201]   The court also found that Nautic and Vistria had tried to conceal Anthony's involvement.[202]

---

[197] *Id.* at 196-98.

[198] Jacobsmeyer Tr. 52-54.

[199] PTO ¶ 78.

[200] *Id.* ¶ 79; *see also EHHI Hldgs., Inc. et al. v. Anthony*, No. DC-21-15717 (192nd Dist. Ct., Dall. Cnty., Tex. June 17, 2022).

[201] JX 2105 ¶¶ 123, 145, 149, 152.

[202] *Id.* ¶¶ 58-67, 99, 105-110; *see infra* notes 403-07 and accompanying text (describing the Chartwell recruitment effort).

The Texas court ruled in Anthony's favor in several respects. It found that Anthony did not solicit certain other Encompass employees.[203] It determined that Anthony neither stole Encompass trade secrets nor violated the confidentiality provisions of her employment agreement.[204] And it rejected Encompass's request for an equitable extension of Anthony's non-compete and non-solicitation covenants.[205]

To remedy her breaches, the court ordered Anthony to comply with her restrictive covenants for the brief remainder of their terms.[206] For Vistria, this was "not a bad outcome" since no damages were awarded.[207] Anthony was free to start at Topco as soon as the covenants expired.[208]

## R.    Anthony's Investment

In August 2022—just weeks after the Texas court's ruling—Anthony and James joined Topco as CEO and President, respectively.[209] Anthony also purchased $87 million of Topco equity from Nautic and Vistria to become a one-third equal

---

[203] *Id.* ¶¶ 71-79, 146.

[204] *Id.* ¶¶ 111-19, 176-78.

[205] *Id.* ¶ 174.

[206] *Id.* ¶ 179.

[207] JX 2085.

[208] *Id.*

[209] PTO ¶ 83.

partner, as contemplated in the parties' term sheet.[210] Topco began conducting business under the name VitalCaring Group.[211]

As part of their "buy-and-build" model for VitalCaring, Nautic and Vistria planned on multi-year growth through acquisitions and an exit after no fewer than five years.[212] Nautic's and Vistria's internal underwriting models dated July 2021, October 2021, and May 2022 projected returns ranging from 3.1 to 5.5 times their initial investments upon a 2026 exit.[213] In more recent June 2023 quarterly projections, Nautic projected meaningful growth for VitalCaring.[214]

These predictions have yet to come to fruition. The value of VitalCaring's business has plummeted over the past three years.[215] Negative market forces affecting the home health and hospice industry have hindered VitalCaring's growth. These headwinds include revenue challenges associated with the adoption of

---

[210] JX 1014 at 8-9; Schuppan Tr. 1723; Corey Tr. 1318. In March 2023, Anthony bought Topco's debt at par—approximately $145 million—and received preferred stock in return. Anthony Tr. 810; Corey Tr. 1401.

[211] PTO ¶ 13.

[212] Vinciguerra Tr. 903-04; Zenner Tr. 1875-80.

[213] JX 3209 at 32; JX 1779 at 1; JX 2034 at 13.

[214] JX 2422 at 2; Vinciguerra Tr. 914-15.

[215] *See* Zenner Tr. 1941-42; Anthony Tr. 660; Vinciguerra Tr. 846; Schuppan Tr. 1643-44; Dudney Tr. 2026-27, 2071.

Medicare Advantage plans, Medicare reimbursement changes, and persistent labor cost pressures.[216]

Even so, Nautic and Vistria remain committed to VitalCaring. They view home health investments as "long-term secular winners" and "enduring business[es]."[217] Corey and Schuppan expect that VitalCaring will deliver significant returns and increased EBITDA as it pursues large acquisitions to "increase its exposure to the [home health and hospice] industry."[218]

VitalCaring continues to assess future acquisitions to further its buy-and-build acquisition strategy. VitalCaring's website states that "[f]rom [its] base in the South, [it is] expanding to serve even more communities nationwide."[219] One example is its June 2024 agreement to purchase certain care centers from Amedisys Inc. and United Health Group.[220]

### S.     This Litigation

On September 9, 2022, Enhabit, Inc. (the spun-off successor entity to Encompass),[221] Advanced Homecare Management, LLC, and EHC filed a complaint

---

[216] *See* Jacobsmeyer Tr. 74-79; JX 2135 at 8-9; JX 2487; JX 2114 at 3.

[217] JX 3205 at 2, 3.

[218] Schuppan Tr. 1841-45; Corey Tr. 1394-95.

[219] VitalCaring Group, "Service Areas," https://www.vitalcaring.com/service-areas-vitalcaring/ (last visited Nov. 27, 2024).

[220] *See* Dkts. 506, 508; *see* Dkt. 503 Ex. A at 2; *infra* note 462 (discussing the deal).

[221] PTO ¶¶ 81-82; JX 2502; Jacobsmeyer Tr. 12.

in this court against Nautic, Vistria, and certain associated entities; as well as Corey, Schuppan, Topco, and Walker.[222]  This decision refers to the plaintiffs collectively as "Encompass."  Nautic, Vistria, their affiliated funds, Corey, and Schuppan are called the "PE Defendants."

After the defendants moved to dismiss, Encompass filed an amended complaint.[223]  It brought six counts.  Count I is a claim against all the defendants for aiding and abetting Anthony's breaches of fiduciary duty.[224]  Count II is a claim for breach of fiduciary duty against Walker.[225]  Count III is a claim against the PE Defendants and Topco for aiding and abetting Walker's breaches of fiduciary duty.[226]  Count IV is a claim against Walker for breach of contract.[227]  Count V is a joint venture liability claim against Nautic and Vistria.[228]  Count VI is an unjust enrichment claim against all defendants.[229]

---

[222] Dkt. 1; *see infra* note 236 and accompanying text (discussing that James and Anthony are not parties).

[223] Dkt. 62 ("Compl.").

[224] *Id.* ¶¶ 107-13.

[225] *Id.* ¶¶ 114-18.

[226] *Id.* ¶¶ 119-24.

[227] *Id.* ¶¶ 125-30.

[228] *Id.* ¶¶ 131-34.

[229] *Id.* ¶¶ 135-39.

The defendants moved to dismiss the amended complaint on March 9, 2023.[230] On May 31, I granted Walker's partial motion to dismiss Count IV.[231] I otherwise denied the motions.[232]

A seven-day trial was held from December 11 to December 19.[233] Post-trial briefing was completed on May 3, 2024, and a post-trial argument was held on May 16.[234] After the parties submitted letters regarding acquisition activities by VitalCaring, the matter was submitted for decision on August 23.[235]

## II.   LEGAL ANALYSIS

Encompass contends that Anthony, James, and Walker breached their duties of loyalty by working to form VitalCaring—a direct competitor. Anthony and James are not defendants.[236] The PE Defendants and Topco are accused of aiding and abetting Anthony, James, and Walker's breaches of fiduciary duty.

---

[230] Dkts. 95-96.

[231] Dkt. 182.

[232] Dkts. 183, 186. Advanced Homecare had previously filed a breach of contract claim against Walker in Texas that remained pending when I heard argument on the defendants' motions to dismiss. Dkt. 186.

[233] Dkts. 465-71.

[234] Dkts. 479, 485, 491, 497.

[235] Dkts. 503-05. Additional letters were since filed, including as recently as last week. Since they were largely updates to prior letters, the date of submission did not change. *See* Dkts. 510, 516-18.

[236] Their employment agreements with Encompass contain mandatory arbitration provisions. *See* JX 107 § 6(q)(ii); JX 108 § 6(q)(ii).

Encompass has the burden to prove its claims by a preponderance of the evidence. "Proof by a preponderance of the evidence means proof that something is more likely than not."[237] Encompass met its burden of proving that Anthony, James, and Walker breached their fiduciary duties to Encompass. It also proved that PE Defendants and Topco aided and abetted these breaches.

Because Encompass has prevailed on its fiduciary duty and aiding and abetting claims, I need not resolve the alternative joint venture liability and unjust enrichment claims. Encompass is entitled to one recovery.[238] That recovery takes the form of an equitable payment stream of VitalCaring's future profits to be administered via a constructive trust, certain mitigation damages, and attorneys' fees.

## A. Breach of Fiduciary Duty

Encompass alleges that Anthony, James, and Walker breached their fiduciary duties. "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[239]

---

[237] *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (explaining that the preponderance standard of proof "means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not" (citation omitted)).

[238] *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1277 (Del. 2021) (describing the double recovery rule).

[239] *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

The first element is not meaningfully in dispute. Anthony was the CEO of Encompass Home Health until June 18, 2021.[240] James was President and Chief Strategy Officer of Encompass Home Health until August 2, 2021.[241] Walker was Encompass Home Health's CFO from February 2020 until June 18, 2021.[242] During their terms, each owed fiduciary duties to Encompass Home Health and EHC.[243]

Anthony, James, and Walker each held key managerial roles leading one of EHC's two major business segments. Their responsibilities included executing Encompass's home health and hospice acquisition strategy, which was the main driver of Encompass Home Health's growth.[244] Encompass relied on Anthony and James to source acquisition targets.[245] Walker collaborated with Anthony and James to evaluate targets and advise EHC on strategy.[246]

---

[240] JX 790; Jacobsmeyer Tr. 15-16.

[241] JX 986; Coltharp Tr. 376; James Tr. 1020-22.

[242] PTO ¶¶ 18-19; Walker Tr. 1492-93, 1525.

[243] *See* Jacobsmeyer Tr. 16; Coltharp Tr. 375-78, 381-81; Anthony Tr. 681-82; James Tr. 1023; Walker Dep. 270; *see also* JX 108 at 1 (Anthony's employment agreement with both EHC and Encompass Home Health, stating that her duties extended to serving as an officer or director of Encompass Home Health's subsidiaries); JX 107 (same regarding James); Coltharp Tr. 375-78 (describing Walker as a "key managerial executive of Encompass"). The job responsibilities of Anthony, James, and Walker extended to Encompass Home Health's main operating entity, Advanced Homecare. *See* Jacobmeyer Tr. 28; JX 2505.

[244] *See* JX 3211 at 8; Jacobsmeyer Tr. 32; Blessing Tr. 301; Coltharp Tr. 378-81, 399; Anthony Tr. 729-30; James Tr. 987; *see also* JX 3185 at 16; Jacobsmeyer Tr. 120-21.

[245] Coltharp Tr. 379-80, 464, 466-67; Jacobsmeyer Tr. 34, 62.

[246] Anthony Tr. 730; Coltharp Tr. 379-80.

Anthony, James, and Walker allegedly breached their duties of loyalty to Encompass in three interrelated ways. First, they usurped Encompass's corporate opportunities. Second, they solicited key Encompass employees for VitalCaring. And third, they misappropriated Encompass's confidential information. Although I analyze these sets of actions separately, they together form an overarching scheme. VitalCaring is the direct result of their disloyalty.

### 1. Usurpation of Corporate Opportunities

"The corporate opportunity doctrine is a consequence of a fiduciary's duty of loyalty, and it exists to prevent officers or directors of a corporation . . . from personally benefitting from opportunities belonging to the corporation."[247] This duty "has been consistently defined as 'broad and encompassing,' demanding of a director 'the most scrupulous observance.'"[248] Claims for usurpation of corporate opportunities are not resolved "on narrow or technical grounds, but upon broad considerations of corporate duty or loyalty."[249]

In *Broz v. Cellular Information Systems, Inc.*, the Delaware Supreme Court explained that a "corporate officer or director" cannot take a business opportunity for herself if:

---

[247] *Grove v. Brown*, 2013 WL 4041495, at *8 (Del. Ch. Aug. 8, 2013).

[248] *Personal Touch Hldg. Corp. v. Glaudbach*, 2019 WL 937180, at *13 (Del. Ch. Feb. 25, 2019) (citation omitted).

[249] *Guth v. Loft, Inc.*, 5 A.2d 503, 511 (Del. 1939).

(1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[250]

"No one factor is dispositive and all factors must be take into account insofar as they are applicable."[251] The analysis is a flexible one guided by equitable considerations. It centers on "whether or not the [fiduciary] has appropriated something for himself that, in all fairness, should belong to his corporation."[252]

The opportunities at issue here are the Original Acquisitions of Homecare Holdings, Vital, and Kare. These three companies were the platform assets used to launch VitalCaring. I consider them in view of each *Broz* factor.

### a. Financial Ability

"The first *Broz* factor looks to whether the company had the financial ability to take on the opportunity."[253] The court has "flexibility in determining whether such an opportunity is financially viable."[254] Delaware courts have considered "the 'insolvency-in-fact' test, as well as considering whether the corporation is in a

---

[250] *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154-55 (Del. 1996).

[251] *Id.* at 155.

[252] *Equity Corp. v. Milton*, 221 A.2d 494, 497 (Del. 1966).

[253] *Deane v. Maginn*, 2022 WL 16557974, at *15 (Del. Ch. Nov. 1, 2022).

[254] *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at *9 (Del. Ch. July 28, 2016); *see also Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275, 279 n.2 (Del. 1995) (noting that a court can assess various measures of financial ability).

position to commit capital, notwithstanding the fact that the corporation is actually solvent."[255] The factor is generally met so long as the entity is solvent and can commit capital. This flexible approach furthers the "sound policy" against permitting fiduciaries to "justify [breaching] conduct on a theory of corporate inability."[256]

None of the plaintiffs were insolvent. Coltharp (EHC's CFO) testified that Encompass maintained "aggregate liquidity of about a billion dollars at the [EHC] level."[257] Encompass had a $1 billion revolving credit facility and access to the public debt markets.[258] It could have committed $408 million to acquire Homecare Holdings, Vital, and Kare.[259]

The defendants accept that Encompass could have made these purchases "in theory."[260] In reality, they say, "financial and operational" restrictions "precluded" Encompass from making these acquisition in 2021.[261] Encompass had historically made just one large acquisition (over $50 million) per year because of integration

---

[255] *Personal Touch*, 2019 WL 937180, at *14 (citing *Riverstone*, 2016 WL 4045411, at *9).

[256] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *23 (Del. Ch. Jan. 25, 2013).

[257] Coltharp Tr. 399.

[258] EHC had $872 million available under its $1 billion revolving credit facility as of the end of the third quarter 2021. Topco had acquired Homecare Holdings and Vital by this point and was finalizing its acquisition of Kare. JX 2751 ¶ 23.

[259] Coltharp Tr. 399-401; *see also* Zenner Tr. 1871-74; JX 2451 ¶¶ 22-30.

[260] Defs.' Post-trial Response Br. (Dkt. 485) ("Defs.' Post-trial Br.") 50, 56.

[261] *Id.*

complexities.[262]  After EHC announced its strategic review in 2020, it operated under leverage constraints that led Coltharp to conclude Encompass should pursue "one but not both" of two large acquisitions under consideration in January 2021.[263]  It chose to acquire Frontier Home Health and Hospice for $95 million rather than Brookdale.[264]  Funding another acquisition with debt would have increased EHC's leverage ratio beyond that permitted by bond indenture covenants, potentially precluding a tax-free spin-off of Encompass Home Health.[265]

Regardless, the *Broz* test considers the "company's ability to pursue the opportunity, not the board's likelihood of actually deciding to do so."[266] Encompass's appetite for other major deals after acquiring Frontier is a different matter than its financial ability to make them.  The leverage thresholds did not block Encompass from making acquisitions.  At the time the Original Acquisition opportunities emerged, EHC was months away from deciding to spin off its home health and hospice business.  If it was concerned about its debt covenants, it could

---

[262] *See* James Tr. 980-81; Blessing Tr. 320-25; Blessing Dep. 12-18.

[263] *See* JX 528; *see also* Blessing Tr. 310-12 (testifying that Coltharp told Encompass it could do "one but not both" of two large acquisitions it was considering); Coltharp Tr. 429-30.

[264] PTO ¶ 69; Coltharp Tr. 386.

[265] *See* JX 340 at 48 (identifying a $240 million breakage cost if Encompass exceeded its net leverage of 3.0x post spin-off); Coltharp Tr. 412-14; *see also* JX 206 at 3.

[266] *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689, at *26 (Del. Ch. Sept. 1, 2023) (explaining that *Broz* is not concerned with whether a company was "eager to commit resources to new projects").

have renegotiated or circumvented the leverage thresholds.[267] None of these potential constraints eliminated Encompass's ability to commit $408 million. EHC's credit line alone gave it the financial capacity to fund the transactions.[268]

### b. Line of Business

An opportunity is in a corporation's "line of business" when it is "reasonably within the scope of [the] corporation's activities."[269] Home health and hospice was one of Encompass's two main business lines.[270] Vital and Kare offered home health and hospice services.[271] Homecare Holdings had other ancillary businesses, but it was primarily a home health and hospice company.[272]

The defendants assert that this factor is unmet because EHC was not a home health business but a holding company with a majority interest in an operating company it planned to divest.[273] Their argument is unpersuasive for two reasons. First, the corporate opportunity doctrine does not require a plaintiff parent entity to

---

[267] Coltharp Tr. 418-20 (testifying that EHC would have sought a consent solicitation for a further leverage increase if the value from pursuing additional targets was greater than the cost of obtaining consent).

[268] *See* Cavanaugh Dep. 305 (defendants' withdrawn expert testifying that Encompass "could have found a way to finance" the Original Acquisitions).

[269] *Guth*, 5 A.2d at 514.

[270] *See supra* notes 14-16 and accompanying text.

[271] *See* Defs.' Pre-trial Br. (Dkt. 398) 44 (conceding this point); Cavanaugh Dep. 80.

[272] *See* Cavanaugh Dep. 79; Defs.' Pre-trial Br. 43.

[273] Defs.' Post-trial Br. 63-64.

itself operate in the line of business in question. If it did, fiduciaries would have license to engage in disloyal behavior whenever the relevant business was held at the subsidiary level. Second, the court must look to the "facts only as they existed at the time" the opportunity arose, "without regard to subsequent events." [274] When the Original Acquisition opportunities became available to Topco, EHC had yet to spin off Encompass Home Health.[275]

The defendants next insist that Homecare Holdings, Vital, and Kare were not "essential" to Encompass.[276] Their argument relies on the *Broz* corollary test for when a director or officer *can* take a corporate opportunity.[277] The corollary to the "line of business" factor is when an opportunity, "because of the nature of the enterprise, is not essential to [the fiduciary's] corporation."[278] But "essential" does not mean that the opportunity was necessary to the corporation. Instead, the "line of business" factor considers whether the opportunity has a "direct or close relation to

---

[274] *Broz*, 673 A.2d at 156; *see also id.* at 158 (noting that the analysis is conducted "without regard to subsequent events" (citing *Guth*, 5 A.2d at 513)).

[275] PTO ¶¶ 81-82. The record suggests that when the Original Acquisition opportunities became available, EHC was continuing to explore acquisitions in the home health and hospice sector. *See, e.g.*, JX 430; *cf. Broz*, 673 A.2d at 156 (concluding that no usurpation occurred where the company was "actively engaged in the process of divesting" relevant assets when the opportunity became available).

[276] Defs.' Post-trial Br. 41.

[277] *Broz*, 673 A.2d at 155.

[278] *Guth*, 5 A.2d at 510-11.

44

any business that [the corporation] was engaged in or had ever been engaged in."[279] The Original Acquisitions were "from [their] nature, in the line of [Encompass's] business."[280]

### c. Interest or Expectancy

The interest or expectancy factor considers any "tie between the opportunity and the nature of the corporation's business."[281] The ties here are obvious. Homecare Holdings, Vital, and Kare were all home health and hospice companies. Home health and hospice was one of EHC's two main business lines at the time the opportunities came about. Encompass's business relied on growth by acquisitions to stay competitive.[282] It devoted significant resources to seek out acquisition targets, relying on James and Anthony to source them.[283]

The defendants highlight features of the Original Acquisitions that they believe break those ties.[284] For example, Homecare Holdings and Kare had

---

[279] *Johnston v. Greene*, 121 A.2d 919, 923 (Del. 1956); *see also Lewis v. Fuqua*, 502 A.2d 962, 968 (Del. Ch. 1985) (equating "essential" with having an "interest or expectancy"); *see also Schreiber v. Bryan*, 396 A.2d 512, 518-19 (Del. Ch. 1978) (treating the "line of business" factor as interchangeable with "essential").

[280] *Guth*, 5 A.2d at 510-11.

[281] *Sorrento*, 2023 WL 5670689, at *26.

[282] Jacobsmeyer Tr. 32-33; *see also* Coltharp Tr. 378-79, 383-84.

[283] *See supra* notes 21-23 and accompanying text; *see also Sorrento*, 2023 WL 5670689, at *26 (considering, in assessing the third *Broz* factor, that a fiduciary's job description "included searching out new development opportunities").

[284] Defs.' Post-trial Br. 41-48.

"negative overlap" with Encompass Home Health, which could have caused market cannibalization in shared geographic markets.[285] As to Vital, Louisiana's legal constraints on out-of-state businesses posed challenges.[286] The defendants also contend that the owners of Homecare Holdings, Vital, and Kare would have been uninterested in selling to Encompass.[287]

Encompass's likelihood of pursuit is irrelevant, however.[288] A loyal fiduciary would have presented the opportunities to Encompass so that it could assess and explore them.[289] Encompass could then decide for itself whether the targets were worth pursuing. Encompass never got the chance. Anthony, James, and Walker kept the Original Acquisition opportunities for themselves, their private equity partners, and the competing business they were forming.

---

[285] *Id.* at 42-46.

[286] Anthony Tr. 645; James Tr. 1010; *see also id.* at 44-45.

[287] Defs.' Post-trial Br. 65. Even if this assertion were true, it would not give the fiduciaries license to usurp an undisclosed opportunity. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 853 (Del. Ch. 2002) (rejecting as insufficient the defendant's contention that an investor "would not have considered" dealing with the plaintiff where the defendant never disclosed or attempted to pursue the opportunity with the plaintiff); *see also Schreiber*, 396 A.2d at 520 (concluding that the "difficulty" in an opportunity was not dispositive of an entity's willingness to pursue it).

[288] *Sorrento*, 2023 WL 5670689, at *26.

[289] *See Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061 n.82 (Del. Ch. 2004) ("While the opportunity may not be the right one after thorough consideration, it was [the company's] to explore."), *aff'd* 872 A.2d 559 (Del. 2005).

46

### d.      Inimical Position

The final *Broz* factor "looks to whether the fiduciary will be competing in some way with the entity he serves or depriving it of an advantage."[290]  It is implicated where "the fiduciary's seizure of an opportunity results in a conflict between the fiduciary's duties to the corporation and the self-interest of the [fiduciary] as actualized by the exploitation of the opportunity."[291]

This factor is easily met.  VitalCaring closed on its first acquisition (Homecare Holdings) weeks after Anthony, James, and Walker left Encompass.[292]  The three had worked extensively toward the Original Acquisitions by then.[293]  They did so while they owed fiduciary duties to Encompass and were charged with furthering Encompass Home Health's acquisition strategy.[294]

### e.      Defenses

Anthony, James, and Walker took numerous steps to form a competitor and help it acquire businesses in the space Encompass Home Health occupied.[295]  They

---

[290] *Maginn*, 2022 WL 16557974, at *18 (citing *Metro Storage*, 275 A.3d at 854).

[291] *Broz*, 673 A.2d at 157.

[292] PTO ¶¶ 72, 76; James Dep. 28.

[293] *See* Corey Tr. 1254-55, 1266-70; Anthony Tr. 583-84.

[294] *See supra* notes 240-43, 283 and accompanying text.

[295] *See supra* Sections I.J-N.

were enmeshed in Nautic and Vistria's efforts to identify platform companies for Topco.[296] And they took remarkable efforts to hide their behavior.[297]

Yet the defendants argue that Anthony, James, and Walker's pursuit of the Original Acquisitions for Topco were legitimate. They assert that the opportunities were (1) presented to Anthony in her personal capacity, (2) found without using Encompass resources, (3) identified by Nautic and Vistria, and (4) part of permissible plans to compete. None of these arguments alleviate the fiduciaries' blatant disloyalty.

i.      *Personal Capacity*

The defendants argue that no usurpation occurred because Nautic and Vistria approached Anthony in her personal capacity.[298] But the relevant point is not whether Anthony was offered an opportunity personally rather than as an officer of Encompass. It is whether the opportunity fell within the scope of Encompass's business, forming a conflict when Anthony exploited it.

In *Guth*, the Delaware Supreme Court rejected a personal capacity theory similar to that advanced here. Charles Guth, the president of Loft, Inc., was approached with an opportunity to acquire Pepsi-Cola assets on favorable terms.

---

[296] *See, e.g.*, Corey Tr. 1170-71, 1223-25; JX 940; JX 3004; JX 952; James Tr. 1032-33; JX 181; JX 191 at 1; JX 78 at 11; JX 196; JX 3136; Walker Tr. 1464-65, 1519-23; JX 3190.

[297] *See infra* Section II.B.1.c.

[298] Defs.' Post-trial Br. 40-41; *see* Anthony Tr. 651-52.

The court considered Guth's argument that the opportunity came to him "personally, and not to him as president of Loft."[299] Though the court found it reasonably inferable that Guth was approached due to skills gained at Loft, it deemed the point non-dispositive.[300]

The "real issue" was whether the corporate opportunity was "so closely associated with the existing business activities of Loft, and so essential thereto, as to bring the transaction within that class of cases where the acquisition of property would throw the corporate officer purchasing it into competition with his company."[301] Loft manufactured syrups, and "[t]he manufacture of syrup was the core of the Pepsi-Cola opportunity."[302] The court therefore held that the opportunity belonged to Loft and that Guth as Loft's officer "had no right to appropriate the opportunity to himself."[303]

So too here. Nautic and Vistria desired Anthony's involvement not only for her expertise but also because of her visibility into the home health and hospice industry as Encompass Home Health's CEO. The Original Acquisition

---

[299] *Guth*, 5 A.2d at 512.

[300] *Id.* at 513.

[301] *Id.*

[302] *Id.* at 514.

[303] *Id.* at 515.

opportunities were in the same space that Encompass Home Health occupied. They were the very sort that Anthony was charged with sourcing for Encompass.

In arguing otherwise, the defendants rely on *Johnston v. Greene*, where the court held that a director did not usurp a corporate opportunity.[304] The "fact that . . . [the] offer . . . came to [the defendant], not as a director of [the plaintiff], but in his individual capacity" was "important" to the court's analysis.[305] More importantly, though, the court found that the opportunity was not in the plaintiff's line of business since the plaintiff had divested any related assets by the time the opportunity arose.[306] That the offer was presented to the defendant individually underscored the absence of "tie[s] between [the opportunity] and the nature of the [plaintiff's] business."[307] Here, Encompass maintained a home healthcare business at the time of the usurpation.[308]

The Original Acquisitions were not simply presented to Anthony (or James or Walker). The fiduciaries actively collaborated with Nautic and Vistria to develop them. Anthony, with help from James and Walker, sought out, researched, analyzed,

---

[304] Defs.' Post-trial Br. 40-41; 121 A.2d at 923.

[305] *Johnston*, 121 A.2d at 923.

[306] *Id.* at 920-21.

[307] *Id.* at 924.

[308] *See supra* notes 273-75 and accompanying text.

and presented on the three opportunities and encouraged the PE Defendants to pursue them for their shared venture.

ii.      *Use of Encompass Resources*

Relatedly, the defendants argue that no usurpation occurred because the Original Acquisitions relied on Nautic's and Vistria's resources.  They assert that Encompass failed to prove that "Anthony used Encompass's money, employees, credit, or facilities to pursue" them.[309]  This statement is belied by the damning record presented at trial.

The time and focus of Anthony, Walker, and James were Encompass assets.[310] But Anthony, James, and Walker pursued the formation of a competing venture while they were "supposed to be devoting [their] time and energy to building" Encompass's business.[311]  Anthony reviewed thousands of pages of materials about the new venture and its targets.  Walker provided his guidance on the targets as well. Anthony even met with Nautic and Vistria representatives in Arkansas and Dallas,

---

[309] Defs.' Post-trial Br. 48.

[310] *See* 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 861.10, Westlaw (database updated Sept. 2024) ("A fiduciary's compensated time is regarded as a corporate asset[.]"); *see also Agranoff v. Miller*, 1999 WL 219650, at *19 (Del. Ch. Apr. 12, 1999) (concluding efforts made "on company time and . . . us[ing] company resources" aided the usurpation of a corporate opportunity).

[311] *Metro Storage*, 275 A.3d at 848.

presented to Nautic's investment committee, and met with Kare's owner.[312] She exploited Encompass's information and employees to further her scheme.[313]

### iii. *Sourcing*

The defendants next assert that the fiduciary duties owed to Encompass by Anthony, James, and Walker are irrelevant because acquisition opportunities were sourced by Nautic and Vistria. They cite two cases for the proposition that "[a] corporation does not own opportunities identified by non-fiduciaries."[314]

In *Triton Construction Co. v. Eastern Shore Electric Services Inc.*, a non-officer employee of an electrical subcontracting company violated limited duties to his employer by "moonlighting" for a competitor.[315] He did so by preparing and submitting bids for the competitor through his job responsibilities for the subcontracting company involved the same tasks. He did not, however, usurp any opportunities by sourcing projects for the competitor. The court made this distinction not because the employee was a non-fiduciary but because his employer lacked an interest or expectancy in such opportunities.[316]

---

[312] Pls.' Post-trial Opening Br. (Dkt. 479) 32-36; PTO ¶¶ 50, 53; Anthony Tr. 755-56, 761, 767-69; 772-73; Corey Tr. 1363-64.

[313] *See infra* Section II.A.2.

[314] Defs.' Post-trial Br. 21.

[315] 2009 WL 1387115, at *13 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010).

[316] *Id*. at *10, *13-14.

Similarly, *Science Accessories Corp. v. Summagraphics Corp.* involved non-officer employees.[317]   As in *Triton*, the determination turned on the plaintiff company's lack of interest or expectancy rather than the defendants' non-fiduciary statuses.  The Court of Chancery held that key managerial employees who developed a competing product while working for a competitor did not breach their fiduciary duties because the plaintiff company was "'neither inclined nor able to develop [similar products]' . . . by reason of its poor financial condition."[318]  The opportunity taken by defendants was an "'outside' opportunity not available to [the plaintiff company]."[319]  The plaintiff abandoned its usurpation claim on appeal.[320]

Neither case addresses a non-fiduciary third party's sourcing of an opportunity.  And neither case supports the notion that a fiduciary responsible for sourcing opportunities within her employer's line of business can seize related opportunities if a third party first identifies them.  Holding otherwise would undermine the teachings of *Guth*, which recognized that "[t]he fiduciary relation demands something more than the morals of the marketplace."[321]

---

[317] 425 A.2d 957, 960 n.5 (Del. 1980).

[318] *Id.* at 963 (citing *Sci. Accessories Corp. v. Am. Rsch. & Dev.*, 1979 WL 2712, at *2 (Del. Ch. Oct. 10, 1979)).

[319] *Id.* at 963.

[320] *Id.* at 961.

[321] *Guth*, 5 A.2d at 515.

iv.     *Preparing to Compete*

Finally, the defendants invoke the "preparing to compete" doctrine to argue that Anthony, James, and Walker were permitted to plan for their future roles while employed by Encompass.[322]  They cite again to *Summagraphics*, which recognized "a privilege in favor of employees which enables them to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty."[323]

As *Summagraphics* explains, however, this privilege stands in tension with the unremitting obligation of undivided loyalty placed on corporate fiduciaries.[324] "The doctrine of corporate opportunity represents one aspect of the law's effort to reconcile these competing policy interests."[325]  Employees have a limited privilege to "make arrangements" to compete, "provided no unfair acts are committed or injury done [to the] principal."[326]

---

[322] Defs.' Post-trial Br. 59-60.

[323] 425 A.2d at 963 (quoting *Md. Metals, Inc. v. Metzner*, 382 A.2d 564, 569 (Md. 1978)).

[324] *Id.* at 962-63.

[325] *Id.* at 963.

[326] *Id.* at 962 (citing Restatement (Second) of Agency § 303 cmt. e (1957)); *see also id.* at 964-65 (stating that a "conspiracy to bring about mass resignation of employer's key employees" is "unfair and wrongful" (citing *Metzner*, 382 A.2d at 569-70)); Fletcher, *supra* note 310, § 856 ("The officer must refrain from actively and directly competing with the employer for customers and employees, and must continue to exert their best efforts on behalf of the employer.").

There is a stark line between permissible preparations to compete and unfair or wrongful conduct. *Summagraphics* gave examples of "misconduct which will defeat the privilege" including "usurpation of [an] employer's business opportunity."[327] Resolving which side of the line one's conduct falls on requires "a thorough[] examination of the facts and circumstances of the particular case."[328]

This case is not a close call. The conduct at issue went far beyond permissible plans to compete. On the same facts, the Texas court found that Anthony affirmatively engaged in competition when she was a fiduciary of Encompass.[329] The record here warrants an even sharper rebuke. Anthony, James, and Walker actively worked to build a competing business while they owed duties of loyalty to Encompass. The preparing to compete doctrine is no excuse for their disloyalty.

\* \* \*

The evidence establishes that Anthony and James strove to benefit themselves at Encompass's expense. They did so willfully, using code names and secretly exchanging diligence materials to hide their misconduct. This deception is unexcused by the defendants' post hoc justifications.

---

[327] *Summagraphics*, 424 A.2d at 965 (citing *Raines v. Toney*, 313 S.W.2d 802, 809-10 (Ark. 1958)).

[328] *Id.* at 965 (citing *Metzner*, 382 A.2d at 569-70).

[329] JX 2105 ¶ 149 ("The evidence overwhelmingly establishes that Anthony's actions were not mere planning for her future, but affirmative 'engage[ment]' in competition." (alteration in original)).

Walker's actions are less striking than those taken by Anthony and James. But he was disloyal just the same. Walker was immersed in Anthony's efforts to form VitalCaring from the outset.[330] He was motivated by the hope of a payout for himself.

The record leaves no doubt that these three individuals—a CEO, President, and CFO—placed themselves in positions inimical to their fiduciary duties. Each worked to covertly set up a competing venture while serving as an Encompass fiduciary.[331] Their efforts included selecting acquisition opportunities within Encompass's line of business and diverting them to Topco. Whether Encompass would have passed on the opportunities remains a mystery since Anthony, James, and Walker deprived it of the chance to consider them. They instead "used their position[s] of trust and confidence to further their private interests."[332] Doing so violated the corporate opportunity doctrine.

### 2. The Broader Disloyal Scheme

The misdeeds of Anthony, James, and Walker were not limited to taking Encompass's acquisition opportunities. The usurpation formed a pillar of their

---

[330] *See, e.g.*, *supra* note 171 and accompanying text (discussing that Walker spoke with Vital and Homecare Holdings principals on Topco's behalf regarding the acquisitions while he was Encompass Home Health's CFO).

[331] PTO ¶¶ 50, 55, 61, 68; *see also* JX 2105 ¶¶ 58-67, 99, 105-10.

[332] *Guth*, 5 A.2d at 510.

broader plan to build a new home health and hospice company. They erected this competitor using Encompass's resources, people, and confidential information. This overall scheme and the resulting enterprise are the products of breaches of the duty of loyalty.

a.      Anthony's Solicitation

Anthony's disloyalty included her solicitation of key Encompass employees for the company that become VitalCaring. Anthony quickly broke her counsel's promise to EHC that she would not discuss her buyout proposal when she disclosed it to Jolley.[333] Anthony went on to recruit Jolley, Riggins, and Walker to take up employment at the new venture.[334]

In early March, Anthony told Jolley about her intention to leave Encompass.[335] Anthony promised Jolley that she would "be back in the future for her employees that meant a lot to her" and that Jolley had a place at Newco.[336] Anthony approached Jolley several more times before leaving Encompass to her plans, Nautic and Vistria's involvement, and the platform acquisition targets.[337]

---

[333] *See supra* note 78 and accompanying text; Jolley Tr. 131-32, 264-66.

[334] *See supra* Section I.L.

[335] Jolley Tr. 132-32, 264-66. Jolley was an exceptionally credible witness. She took personal risks in revealing Anthony's plans (which Jolley initially shared) to Jacobsmeyer. Jolley's courage is commendable.

[336] *Id.*

[337] *Id.* at 134-37.

During one discussion, Anthony showed Jolley a spreadsheet based on the same 15% MEIP allocation reflected in Corey's term sheet.[338] The spreadsheet assigned multi-million-dollar values to Topco equity that Jolley and others would receive.[339] As Anthony put it, Jolley could expect "life-changing wealth" at Topco.[340] Anthony initially convinced Jolley to join her—until Jolley's conscience got the better of her.[341]

Anthony showed Riggins a similar spreadsheet and discussed the MEIP with her in June.[342] Riggins decided to leave Encompass on the promise of earning millions from Topco equity.[343] Walker was also swayed. He testified that it was "no coincidence" he accepted Topco's offer the same day Anthony sent him her spreadsheet valuing his Topco stake at $21 million.[344]

---

[338] Anthony Tr. 663-64; Jolley Tr. 144-48.

[339] *See supra* note 141.

[340] Jolley Tr. 145; *see also* JX 2068 at 481 (testifying that she hoped the equity spreadsheet would be "helpful" in recruiting employees to Newco).

[341] *See Park Lawn Corp. v. PlotBox, Inc.*, 2021 WL 5038751, at *3 (D. Del. Oct. 29, 2021) (remarking that even though a CEO failed to recruit the plaintiff's officer, he "hardly acted loyally by trying," which was sufficient to plead a breach of fiduciary duty claim).

[342] Jolley Tr. 155-57; Anthony Tr. 653-54.

[343] Jolley Tr. 146-49, 162-63; JX 1114.

[344] Walker Tr. 1537-42; *see also* JX 1114; JX 2105 ¶ 63.

The defendants admit that Anthony solicited Jolley, Riggins, and Walker.[345] It is undeniable. The Texas court found that Anthony's solicitation of those individuals breached restrictive covenants in her Encompass employment agreement.[346] Still, the defendants claim that Anthony's actions aligned with her fiduciary duties given the lack of a "mass resignation."[347]

An officer need not cause a mass employee exodus to breach her duty of loyalty. Delaware courts have recognized that inducing the resignation of just a few employees to join a competitor may constitute a breach of fiduciary duty.[348] Here, Anthony convinced several key employees to join a competing venture while she was Encompass Home Health's CEO. This is not the behavior of a loyal fiduciary.

---

[345] *See* Defs.' Post-trial Br. 95 ("Anthony solicited only two employees who left Encompass (Walker and Riggins) . . . ."); *see also id.* at 6, 61. The defendants insist that Anthony only pursued Walker and Riggins after they expressed a desire to leave Encompass. But it seems more likely than not that Anthony and her MEIP spreadsheet were the driving force behind Walker's and Riggins's resignations. *See* Walker Tr. 1461-65, 1504-06, 1518-19; JX 1989 (Riggins Tex. Dep.) 25; Jolley Tr. 155-57.

[346] Defs.' Post-trial Br. 18-19; JX 2105 ¶¶ 145, 163-65.

[347] Defs.' Post-trial Br. 95 (quoting *Summagraphics*, 425 A.2ds at 965). Unlike the defendant in *Summagraphics*, Anthony was not middle management. She was the CEO of Encompass Home Health and tasked with running its operations. *Summagraphics* also espouses a broad inquiry into the "facts and circumstances of the particular case," not a brightline test based on the number of employees solicited. *Summagraphics*, 425 A.2d at 964-65. By poaching key members of Encompass's management team for a competitor, among other disloyal acts, Anthony put her personal interests above those of Encompass.

[348] *See, e.g.*, *Beard Rsch.*, 8 A.3d at 603 (finding that the defendant "induc[ed] the resignation of certain of [the company's] key employees" to a competitor "while he owed fiduciary duties" to the plaintiff, which was one of several breaches of fiduciary duty in connection with a corporate opportunity scheme).

59

b.     Misuse of Encompass Information

A fiduciary "has a duty not to use or communicate confidential information . . . for [his] own purposes or those of a third party. This duty prohibits the use of the [company's] confidential information in competition with the [company]."[349] Anthony, James, and Walker failed to fulfill this obligation when they used Encompass's confidential information to advantage themselves at the company's expense.

As early as August 2020, Anthony and James gave Nautic "feedback" to facilitate their buyout proposal, including Encompass's admissions growth rates, Medicare reimbursement rates, and costs per visit.[350] Certain information that was non-public at the time allowed Nautic to develop a "more detailed build" of its model.[351] The defendants dispute the sensitivity of this information, but Anthony and James's use of screen sharing to convey it shows their understanding that it was to be kept in confidence.[352] A breach of fiduciary duty claim "can be premised on

---

[349] *Triton*, 2009 WL 1387115, at *15.

[350] *See* James Tr. 1032-33; Anthony Tr. 583-84; Corey Tr. 1254-58; *supra* notes 40-41 and accompanying text.

[351] *See* JX 191 at 1 ("adjust[ing] cost per visit [to] $75 on go-forward basis" on Aug. 31, 2020); JX 3135 at 61 (disclosing Q3 2020 cost per visit as $75 in Oct. 29, 2020 earnings presentation); Corey Tr. 1266-72.

[352] JX 181 at 1; JX 188 at 1 (Corey re: "call today with Luke" writing "suggest we have zoom working sessions with screen shares only"); JX 78 at 11 (Aug. 25, 2020 text from James to Anthony: "I'm on with Nautic in office."); James Tr. 1030; *see also* JX 186

the misuse of a plaintiff's confidential information, even if that information does not rise to the level of a trade secret."[353]  James and Walker admitted at trial that the information they relayed to the PE Defendants "would have been inappropriate" to share "with outside parties."[354]

In the fall of 2020, Anthony and James told Nautic and Vistria about the non-public strategic review EHC was launching of its home health and hospice business.[355]  Anthony, James, and Walker also gave Nautic information about Encompass's potential bid for Brookdale.[356]  After EHC passed on Brookdale, Anthony—using her spouse's email, Walker's personal email, and a shady subject line—gained James and Walker's input on refining Nautic's projections for a combination of Brookdale and Encompass Home Health.[357]

Another example of the defendants' misuse of confidential information came towards the end of Anthony's tenure.  In May 2021, about a month before her last

(Nautic Zoom invite to James for Aug. 25, 2020 meeting); JX 196 (James forwarding the Zoom invite to his personal email address).

[353] *Beard Rsch.*, 8 A.3d at 602 (citing *Summagraphics*, 425 A.2d at 965).

[354] James Tr. 1051; *see* Walker Tr. 1516-19, 1521-24.

[355] Anthony Tr. 694-701; Coltharp Tr. 404-05; Schuppan Tr. 1736-42, 1800-01; *cf. United States v. Contorinis*, 692 F.3d 136, 143-44 (2d Cir. 2012) (holding that confirmation a board was actively considering a strategic review was material non-public information).

[356] *E.g.*, Corey Tr. 1290-93; Walker Tr. 1505-06, 1509-11; JX 347 at 2; JX 441 at 1 ("From Mark Anthony"); JX 485.

[357] JX 441 at 1; *cf.* JX 485; *see supra* notes 66-67 and accompanying text.

day at Encompass, Anthony hosted a weekend retreat at her Idaho lake house.[358]  The

Encompass Home Health management team (other than the general counsel)

attended.[359]  The retreat included a morning "[b]rainstorming session" billed as

"giv[ing] everyone clarity of direction as April departs."[360]  The team was asked

"what [they] would want to do to continue progressing . . . what [wa]s working; what

should be given fresh perspective; if [they] had to do over, what [they] wish [they]

had done differently; [and] what [they] would [] never change."[361]  Anthony took

notes.

Anthony summarized the feedback in a document she titled "Key

Structures."[362]  The document contained confidential information about Encompass

Home Health's staffing productivity requirements and employee pay.[363]  Anthony

saved the document for use in her new endeavor.  She later gave the document to

Walker on a flash drive during his stay at her home in Idaho.[364]  He used the

information to form the operational plan for their new venture.[365]

---

[358] JX 979; Jolley Tr. 203-06; Anthony Tr. 669-70.

[359] *Id.*

[360] JX 979 (native).

[361] *Id.*

[362] Jolley Tr. 208.

[363] *See id.* at 209-12.

[364] Anthony Tr. 804.

[365] *See id.* at 804-06; JX 2068 at 111-15.

The universe of confidential information that Anthony, James, and Walker shared with Nautic and Vistria remains unknown. That may be a function of their concealment efforts. Whether the use of this information caused cognizable harm to Encompass or gains for the defendants is also opaque.[366] What is clear, though, is that the three fiduciaries gave Encompass's confidential information to Nautic and Vistria in furtherance of establishing a competitor. Doing so was a breach of fiduciary duty.[367] As the Texas court recognized, "Encompass is now faced with the prospect of increased competition with a new home health care business in Texas . . . armed with Encompass's confidential information."[368]

---

[366] Some information sharing seems to have been inconsequential. For example, neither Nautic nor Encompass acquired Brookdale. *See supra* Section I.F. That is not the point. The actions exemplify Anthony, James, and Walker's intention to use Encompass information to compete against it. No separate damages are being awarded for these specific acts. *See infra* Section III.

[367] *See Metro Storage*, 275 A.2d at 855 ("The misuse of confidential information is 'inherently a breach of fiduciary duty.'" (citing *PT China LLC v. PT Korea LLC*, 2010 WL 761145, at *7 & n.36 (Del. Ch. Feb. 26, 2010))); *BelCom, Inc. v. Robb*, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998) ("A former director, of course, breaches his fiduciary duty if he engages in transactions that had their inception *before* the termination of the fiduciary relationship or were founded on information acquired *during* the fiduciary relationship." (emphasis in original)).

[368] JX 2105 ¶ 121. The defendants argue that the Texas court's ruling forecloses this court from considering whether Anthony's actions resulted in VitalCaring possessing certain Encompass Home Health operating documents. Defs.' Post-trial Br. 108-09. But the narrow issue litigated in Texas was whether Anthony misappropriated trade secrets or breached her contractual prohibition against disclosing Encompass's employee manuals. The Texas court was not asked to consider whether Anthony acted disloyally. Nor was it confronted with certain instances of information sharing addressed here. *See Eagle Props.,*

*          *          *

Disillusioned with EHC, Anthony set out to "get [her] baby back."[369]  She partnered with Nautic and Vistria and brought along James and Walker.  When her plan failed, she turned her focus to creating a competitor.[370]  As she told Nautic's investment committee, there was value in getting started while she remained at Encompass and could "access people and relationships."[371]

So they did.  Anthony, Walker, and James—all senior officers—usurped acquisition opportunities falling within Encompass's line of business.  They swayed key Encompass employees to join them using the promise of Topco equity.  Their efforts were fortified with Encompass confidential information.  Great pains were taken to conceal their actions.

The duty of loyalty imposes on a fiduciary "an affirmative obligation to protect and advance the interests of the corporation" and to "absolutely refrain from any contact that would harm" it.[372]  Anthony, James, and Walker did the opposite.

*Ltd. v. Scharbauer*, 807 S.W.2d 714, 721-22 (Tex. 1990) (explaining that collateral estoppel precludes only "the relitigation of identical issues of fact or law which were actually litigated and essential to the prior judgment").

[369] JX 3189 at 16 (text from Anthony to Schuppan on Oct. 26, 2020); *see* Anthony Tr. 683.

[370] *See supra* Section I.H.

[371] JX 748 at 45.  The contemporaneous notes of this meeting were prepared by Chris Vinciguerra, a managing director at Nautic.  Vinciguerra Tr. 837.  Vinciguerra was a highly credible witness.  Despite his role at Nautic, he testified in detail about Anthony's thick involvement in the Original Acquisitions.

[372] *BelCom*, 1998 WL 229527, at *3 (citing *Guth*, 5 A.2d at 510).

64

They strove to benefit themselves and their co-venturers to the detriment of Encompass. Each of the three committed acts that amount to egregious breaches of the duty of loyalty.

### B. Aiding and Abetting

Encompass accuses the PE Defendants and Topco of aiding and abetting breaches of fiduciary duty.[373] "For a claim of aiding and abetting a breach of fiduciary duty, a plaintiff must prove '(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach.'"[374] The first two elements were proven by Encompass, as addressed above.[375] As explained below, the knowing participation element—"often the most difficult to prove"[376]—is also met.

[373] Encompass also brought an aiding and abetting claim against Walker. *See* Compl. ¶¶ 107-13. Its post-trial briefs are silent on that specific claim. I consider it waived by omission and decline to address it. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[374] *RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

[375] *See supra* note Section II.A.

[376] *In re Mindbody, Inc., S'holder Litig.*, No. 484, 2023, slip op. at 70 (Del. Dec. 2, 2024). In *Mindbody*, the Delaware Supreme Court explained that knowing participation requires "active participation rather than 'passive awareness.'" *Id.* at 74 (quoting *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co.*, 2017 WL 3172722, at *10 (Del. Ch. July 24, 2017)). The court distinguished the facts presented from those in *RBC*, where intentional and purposeful actions were taken in furtherance of a breach of fiduciary duty. *Id.* at 75 n.88

Aiding and abetting claims are difficult to prove by design.[377]  An accused aider and abettor only faces liability if she participated in the breach with scienter. This standard is met here.  The record is replete with facts demonstrating knowing participation.

### 1. The PE Defendants

Knowing participation consists of two factors: knowledge and culpable participation.[378]  For the first factor, a plaintiff must prove that a defendant had "knowledge that the conduct advocated or assisted constitutes such a breach."[379]  The defendant must have "act[ed] knowingly, intentionally, or with reckless indifference; that is, with an illicit state of mind."[380]  The second factor involves culpable participation alongside a fiduciary in making the challenged decision, facilitating or inducing a breach of fiduciary duty, misleading the fiduciary with

(citing *RBC*, 129 A.3d at 865).  This case falls on the "active participation" side of the line. As in *RBC*, the aiders and abettors here willfully engaged in the fiduciaries' misconduct. With full awareness that their actions were wrong, the aiders and abettors drove the fiduciaries' efforts to covertly siphon opportunities, information, resources, and employees from Encompass.  *See infra* notes 396-419 and accompanying text.

[377] *RBC*, 129 A.3d at 865-66 ("[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to prove.").

[378] *See Mindbody*, slip op. at 70-71.

[379] *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *11 (Del. Ch. Oct. 27, 2020) (citing *Malpiede*, 780 A.2d at 1097).

[380] *Id.* at *17 (citing *RBC*, 129 A.3d at 862); *see also Mindbody*, slip op. at 71 ("Knowledge that the primary party has breached its fiduciary duty is not enough . . .  a plaintiff must also demonstrate that the aider and abettor had actual knowledge 'that their conduct was legally improper.'" (quoting *RBC*, 129 A.3d at 862)).

materially false information, or creating an information vacuum.[381] Encompass proved both factors.

### a. Knowledge

Nautic and Vistria knew that Anthony, James, and Walker could not create a competitor without violating their fiduciary duties to Encompass.

Nautic's and Vistria's prior litigation experiences provided them with a general understanding of this risk. In 2016, Nautic disgorged $70 million to settle claims involving its acquisition of Reliant Hospital Partners. It had been sued for aiding an executive's usurpation of a corporate opportunity, misappropriating confidential information, and soliciting employees.[382] Corey had been named as a defendant.[383] Vistria had been embroiled in similar litigation when an operating partner was sued by her former home health company employer (a Vistria portfolio company) for breaching non-competition and non-solicitation covenants.[384]

---

[381] *See Firefighters Pension Sys. of City of Kansas, Missouri Trust v. Presidio, Inc.*, 251 A.3d 212, 275 (Del. Ch. 2021); *see also Mindbody*, slip op. at 73-74 ("[P]articipation in an aiding and abetting claim requires that the aider and abettor provide 'substantial assistance' to the primary violator." (quoting *In re Dole Food Co. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015)).

[382] *See* Corey Tr. 1227-31; JX 36 ¶¶ 54-55; JX 32; *see also Cornerstone Healthcare Grp. Hldg, Inc. v. Nautic Mgmt. VII, L.P.*, 493 S.W.3d 65 (Tex. 2016).

[383] *See* Corey Tr. 1223-29.

[384] *See Deary v. Great Lakes Acquisition Corp.*, 2021 WL 5234500 (E.D. Mich. Nov. 10, 2021).

67

Schuppan served on the board of that company and was deposed in the matter.[385]

The experiences served as cautionary tales for Corey and Schuppan.[386]

The Ropes roadmap memo eliminates any remaining doubt that Nautic and Vistria understood how to engage with Anthony while she was an Encompass fiduciary. Counsel told the PE Defendants that "[e]ntering into an agreement . . . with respect to a specific opportunity that would be competitive" while Anthony was still with Encompass would support "claims . . . that Nautic/Vistria aided and abetted the breach."[387]

The Ropes memo further outlined how Newco could recruit employees without colliding with Anthony and James's non-solicitation restrictions.[388] It cautioned that Anthony should not openly recruit Encompass Home Health employees or "communicate with others at [Encompass] about her potential future plans."[389] These "non-solicit and no-hire obligations d[id] not apply to Nautic or

---

[385] Schuppan Vol. I Dep. 12-13.

[386] *See* Corey Tr. 1223-25; *see* Schuppan Vol. I Dep. 12-22.

[387] JX 904 at 2; *see also* JX 676 at 4 (advising that "[e]ven if EHC learns about the contemplated arrangement, an informal arrangement lessens the 'optics' argument that April is inevitably competing by immediately collaborating with Nautic and Vistria").

[388] Nautic and Vistria were encouraged "[to] reach out to Luke [James] to continue [hiring] discussions at the appropriate time, and to continue to build a favorable record demonstrating that they have an independent relationship with Luke." JX 676 at 6.

[389] *Id.* at 3.

Vistria."[390]  The memo suggested that Nautic and Vistria retain an outside recruiting firm to pursue Encompass Home Health employees and "potentially hire one or two senior employees who are not from [Encompass Home Health]."[391]

The memo also listed "[g]eneral [p]rotocols" that Nautic, Vistria, and Anthony should follow to "[m]itigate [p]otential [r]isks" of being sued by Encompass.[392]  They were discouraged from discussing Newco matters using Encompass devices and accounts, which were "likely reviewable by [Encompass]."[393]  They were advised to discuss "up front the types of written communications" they intended to distribute electronically.  They were told "to stay away from any discussions implicating [Encompass's] confidential information.[394] And they were instructed that "[a]ny written agreements between any of the parties be carefully crafted by counsel to avoid any inference that April is violating her restrictions."[395]

---

[390] *Id.* at 6.

[391] *Id.*

[392] *Id.* at 7.

[393] *Id.* at 8.

[394] *Id.* at 3, 7.

[395] *Id.* at 7-8.

### b. Participation

Despite their knowledge of the risks of aiding and abetting liability, Nautic and Vistria—through Corey and Schuppan—actively encouraged and facilitated Anthony, James, and Walker's breaches in pursuit of financial upside. Their participation began by December 2020 when they wrote a term sheet for their new venture.[396] By early 2021, they acted to make it a reality.[397]

The PE Defendants worked with Anthony, James, and Walker to identify Homecare Holdings as the base for their platform, with Vital and Kare as the two other components.[398] They shared diligence materials about the acquisition targets with Anthony and consulted her about the negotiations.[399] Nautic even had Anthony present to its investment committee as the presumptive leader of the venture.[400] These events took place while Corey and Schuppan knew that Anthony, James, and Walker were Encompass Home Health officers.[401]

---

[396] *See* JX 388; *see also* JX 390; Corey Tr. 1300-02.

[397] JX 662; JX 688; Corey Tr. 1304-06.

[398] *See supra* text accompanying note 102.

[399] *E.g.*, JX 3189 at 29; JX 3215 at 50; Anthony Tr. 754-61; Schuppan Tr. 1699-1700, 1754-56; JX 748 at 45; Vinciguerra Tr. 830-31, 887-91; JX 1083; JX 967.

[400] Anthony Tr. 772; JX 1025; Vinciguerra Tr. 886-87.

[401] The knowledge of Corey and Schuppan is imputed to the entities they serve as agents. *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) ("Delaware law states that the knowledge of an agent while acting within the scope of his or her authority is imputed to the principal."); *Triton*, 2009 WL 1387115, at *16 ("Eastern also is liable for aiding and abetting because the knowledge and conduct of Elliott, its controlling officer, are imputed to it.").

The PE Defendants were also active participants in Anthony's solicitation of Encompass employees. They understood that Anthony's plan from the start was to "keep the [Encompass Home Health] management [] team together."[402] To obscure this plan, the PE Defendants hired a recruiting firm in mid-April 2021 called Chartwell Partners to create a "paper trail" of legitimate recruitment.[403] The process was a "sham."[404] As Walker told a friend just before Chartwell contacted him, "they needed a 3rd party to conduct a 'search' . . . ."[405] Corey and Schuppan gave Chartwell the names of Walker, Jolley, and Riggins.[406] Chartwell then arranged interviews.[407]

The PE Defendants further drove efforts to gain Encompass confidential information, first for a buyout of Encompass Home Health and then to form a

---

[402] JX 414.

[403] Jolley Tr. 157-60, 263-66; Bush Tr. 283-90; *see also* Anthony Tr. 795; James Tr. 1064-66.

[404] In support of its final judgment, the Texas state court found that Nautic and Vistria concealed Anthony's involvement, including through Chartwell's "sham recruitment" of Encompass employees. *See* JX 2105 at ¶¶ 58-60, 64; *see also supra* Section I.Q.

[405] *See* JX 294 at 3 (Walker texting a friend that Chartwell had been "'hired' to reach out [to him] for the newco team" (scare quotes in original)).

[406] Bush Tr. 281, 286-87, 290.

[407] Chartwell was unaware that its work was pretense. For example, Schuppan thanked a bewildered Chartwell recruiter for the "lead" on Walker even though Schuppan had given Walker's name to Chartwell. JX 968; *see* Bush Tr. 281-83; JX 1048 at 1. In another strange move, Corey asked that a call invitation to Walker be titled "[i]ntroductory" though the two had been communicating for months. JX 1057; *see* Corey Tr. 1377-79; Walker Tr. 1535-37.

competitor. For example, Nautic's August 2020 model used information obtained from Anthony and James by screen share.[408] The PE Defendants sought from Walker and Anthony information about acquisition targets Encompass had considered and reasons why they were passed on.[409]

### c. Concealment

The PE Defendants took care to conceal Anthony's involvement in their scheme.[410] Their deception is indicative of their knowledge that these actions were wrong.[411]

The PE Defendants shielded their discussions with Anthony by filtering them through counsel. Ropes executed a common interest agreement with Nautic and Vistria's litigation counsel.[412] Nautic and Vistria believed that this agreement provided a layer of protection, allowing them to share diligence materials with their

---

[408] JX 181; JX 188; JX 191. Corey testified that he preferred using screen sharing to avoid disseminating Nautic information. Corey Tr. 1248. This excuse is illogical since he was sharing Nautic's model with third parties by Zoom. It seems more likely that Corey wanted to screen share because he knew Nautic was improperly receiving sensitive Encompass information from James and Anthony.

[409] *See, e.g.*, JX 748 at 78 (reflecting Walker's comments on Encompass declining to pursue Queen City); Vinciguerra Dep. 281-82; Schuppan Vol. I Dep. 282-82, 311-12.

[410] *See, e.g.*, PTO ¶¶ 50, 55, 61; Jolley Tr. 137-42; Anthony Tr. 755-61; Schuppan Tr. 1684-85, 1699; James Tr. 1059-60; Corey Tr. 1338-39; JX 990; JX 952; JX 940; JX 910 at 1.

[411] *See Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at *25 (Del. Ch. July 30, 2021) (observing that the defendants were "conscious of their wrongdoing because each engaged in acts of subterfuge designed to conceal their conduct").

[412] JX 860 at 2-4.

litigation counsel, who would send them to Ropes lawyers, who would then forward them to Anthony.[413]

One striking instance involves Corey sending Nautic's litigation counsel a Homecare Holdings slide deck called "Confidential Information Presentation," which litigation counsel sent to Ropes lawyers, who sent it to Anthony, who then sent feedback to Ropes, who sent it to Nautic's litigation counsel, who forwarded it back to Corey the next day.[414]  Nautic's counsel billed time for the forwarding to a matter called "Project AALJ"—a reference to April Anthony and Luke James.[415]  In communications without lawyers, Schuppan, Corey, and their teams avoided mentioning Anthony by name.  The Vistria team referred to her as "Voldemort," an unnamed "coinvestor," or "our Idaho friend."[416]  When a Nautic employee slipped and mentioned Anthony in an email, Corey tried to correct it by responding: "We aren't sharing [Homecare Holdings] info with April."[417]

---

[413] *See* JX 990; JX 952; JX 1022 at 2; JX 910 at 1.

[414] JX 9004; JX 952.

[415] JX 3201 at 7.

[416] *See* Schuppan Tr. 1695-98; JX 1557; Schuppan Dep. 154; *see also* Kuchibhotla Dep. 119; Tang Dep. 136-37 (confirming that the use of the nickname Voldemort to refer to Anthony was a "rif[f] on the Voldemort he-who-must-not-be-named joke"); JX 956 at 15; JX 776 at 2 ("[P]lease always reference Nautic and Vistria as 50/50 partners.  No mention of Mgmt please."); Ramaker Dep. 76.

[417] Vinciguerra Tr. 939-40; JX 933 at 1.

Other communications were edited or destroyed. Nautic scrubbed Anthony's name from its deal file, deleting a reference to Anthony as the "Executive Angle" on the HCH opportunity.[418] Schuppan manually deleted all text messages on the matter—even after receiving a subpoena from Encompass.[419]

The PE Defendants willfully ignored Ropes's advice. Instead of striving to heed it, their focus was on not getting caught. Their clandestine actions were designed to aid and abet Anthony, James, and Walker's breaches of fiduciary duty.[420]

### 2. Topco

Though the evidence is thinner than that relating to the PE Defendants, Topco is also liable under an aiding-and-abetting theory. Topco existed no later than May 18, 2021—while Anthony, James, Walker remained Encompass fiduciaries.[421] Because Corey and Schuppan are fiduciaries of Topco as its managers, their knowledge and acts are imputed to Topco under agency principles.[422] This

---

[418] Corey Dep. 250-56; *see* JX 791 at 1.

[419] Schuppan Tr. 1687-88.

[420] *See Agranoff*, 1999 WL 219650, at *21 (finding that a defendant aided and abetted breaches of fiduciary duty where he "encouraged, helped plan, and knowingly participated in those breaches of duty").

[421] PTO ¶ 62 (stipulating that Topco extended a formal offer to Walker on May 18, 2021).

[422] *See Carr v. New Enter. Assocs.*, 2018 WL 1472336, at *16 (Del. Ch. Mar. 26, 2018) ("A director's knowledge and participation in a breach may be imputed to a non-fiduciary entity for which that director also serves in a fiduciary capacity."); *see also Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 302-03; *supra* note 148 and accompanying text; JX 1090 at 1-2.

74

imputation includes Corey and Schuppan's aiding and abetting usurpation of the Original Acquisitions, solicitation of key Encompass employees, and misappropriation of confidential information.[423] Topco's involvement continued after June 18, 2021 when Anthony and Walker left Encompass. In July, Walker—then Topco's interim CEO—received the "Key Structures" document Anthony created in May and used it to set up Topco's operating structure.[424]

*      *      *

Encompass proved by a preponderance of the evidence that the PE Defendants and Topco knowingly participated in Anthony, James, and Walker's breaches of fiduciary duty. It was damaged as a result.[425] Time, talent, and resources belonging to Encompass were used to form a competitor. The PE Defendants and Topco are jointly and severally liable with Walker for Encompass's damages.[426]

---

[423] *See supra* Section II.B.1.

[424] *See supra* notes 362-65 and accompanying text; PTO ¶ 74.

[425] *See infra* Sections III.A, B.

[426] *See Malpiede*, 780 A.2d at 1096 n.75 (citing *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168, 170 (Del. 1976) ("[P]ersons who knowingly join a fiduciary in an enterprise which constitutes a breach of his fiduciary duty of trust are jointly and severally liable for any injury which results.")). Although Encompass claims breaches of fiduciary duty by Anthony, James, and Walker, Walker is the only defendant of the three. *See* PTO ¶ 1. Accordingly, Walker is the only former fiduciary who is jointly and severally liable with the PE Defendants and Topco. *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002); *Beard Rsch.*, 8 A.3d at 619 (holding that defendants who aided and abetted a fiduciary's breach were jointly and severally liable with the fiduciary). This is a distasteful outcome in a sense, since Walker is on the hook while

## III. REMEDIES

Encompass proved that Anthony, James, and Walker breached their fiduciary duties and that the PE Defendants and Topco aided and abetted the breaches. Encompass must also prove its damages by a preponderance of the evidence.[427]

Three types of recoveries are sought. First, Encompass requests monetary damages to remedy the disloyal formation of VitalCaring and usurpation of opportunities from Encompass. Second, it seeks mitigation damages to lessen the harm caused by Anthony's solicitation of Encompass employees and to compensate it for the costs of the Texas litigation. Third, it asks that the defendants pay its attorneys' fees from this suit.

My assessment of the appropriate relief is guided by several tenets of our law. Delaware does not "require certainty in the award of damages where a wrong has been proven and injury established."[428] So long as "the plaintiff can prove the fact of damages with reasonable certainty . . . [t]he amount of damages can be an

---

Anthony and James are not. The nature of the primary remedy awarded may lessen this imbalance to some extent, it concerns VitalCaring's future profits (if any) and no separate damages are sought from Walker's MEIP. *See infra* Section III.A. Joint and several liability may play a greater role in the mitigation damages and attorneys' fees awarded.

[427] *E.g.*, *Mobilactive*, 2013 WL 297950, at *24.

[428] *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992).

estimate."[429]   These principles are bolstered where the harm is caused by disloyalty.[430]   "[O]nce a breach of duty of loyalty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."[431]   "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[432]

## A.      Damages for the Disloyal Formation of VitalCaring

The Delaware Supreme Court's epochal *Guth* decision outlines the policy goals animating remedies for breaches of the duty of loyalty, including for usurpation of corporate opportunities.[433]   The remedial goal is not a compensatory one.  It rests instead "upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation."[434]   That is,

---

[429] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015); *see also Beard Rsch.*, 8 A.3d at 613 ("Responsible estimates of damages that lack mathematical certainty are permissible so long as the court has a basis to make such a responsible estimate.").

[430] *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000).

[431] *Maginn*, 2022 WL 16557974, at *19 (citation omitted).

[432] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

[433] *Guth*, 5 A.2d at 510 ("The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence . . . .").

[434] *Id.* at 510; *see also Mobilactive*, 2013 WL 297950, at *23 (explaining that defendants who breached their duties of loyalty may be required to "disgorge all profits and equity from the usurpation").

damages must ensure that a fiduciary cannot profit from actions counter to the interests of the corporation she is duty bound to serve.[435]

Despite these plaintiff-friendly principles, fashioning a remedy here is tricky. Encompass asks that I award it rescissory damages, disgorgement, or compensation for lost profits.[436] But VitalCaring has no profits to disgorge.

Still, equity must right a wrong. "[V]iolations of the duty of loyalty" warrant "strong medicine."[437] After considering the typical damages measures, I conclude that Encompass is entitled to a portion of any future gains VitalCaring realizes. This approach is neither a complete cure for the defendants' blatant misconduct nor punitive. But it maintains incentives for the defendants to grow VitalCaring while recognizing that VitalCaring got a head start at Encompass's expense.

### 1. Rescissory Damages and Disgorgement

Rescissory damages are intended to restore the injured party to the position it was in before the challenged event occurred.[438] Disgorgement prevents unjust

---

[435] *Guth*, 5 A.2d at 510 ("If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law . . . denies to the betrayer all benefit and profit.").

[436] Pls.' Post-trial Opening Br. 92.

[437] *In re MFW S'holders Litig.*, 67 A.3d 496, 532 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[438] *See, e.g.*, *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501 (Del. 1981), *overruled in part on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *see also*

enrichment by requiring a wrongdoer to return any profits they have gained through improper acts.[439] Encompass treats rescissory damages and disgorgement interchangeably insofar as it demands the value the defendants appropriated for themselves. Rescissory damages would "force the defendant[s] to disgorge profits that the[y] may have achieved through the wrongful retention of the plaintiff's property."[440]

Encompass seeks rescissory damages or disgorgement of $462 million.[441] This estimate is supported by the work of Dr. Marc Zenner—a corporate finance and valuation expert and former investment banker.[442] Zenner applied an "expected gains" methodology to calculate the present value of Nautic and Vistria's expected profits. His analysis is based on projections Nautic and Vistria prepared for their respective investment committees—Nautic in July 2021 and Vistria in October 2021

*In re S. Peru Copper Corp. S'holder Deriv. Litig*., 52 A.3d 761, 815 (Del. Ch. 2011) ("Rescissory damages are the economic equivalent of rescission."), *aff'd sub nom. Am. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

[439] *See TIAA-CREF Individual & Inst. Servs., LLC v. Illinois Nat'l Ins. Co.*, 2016 WL 6534271, at *10 (Del. Super. Oct. 20, 2016) ("Disgorgement is defined as 'the act of giving up something (such as profits illegally obtained) on demand or by legal compulsion.'" (citing *Disgorgement*, Black's Law Dictionary (10th ed. 2014))).

[440] *In re Orchard Enters., Inc. S'holder Litig*., 88 A.3d 1, 39 (Del. Ch. 2014).

[441] Pls.' Post-trial Opening Br. 92.

[442] JX 2454 ("Zenner Rep.") App. A.

and May 2022.[443]   Using the projections, Zenner calculated the present value of Nautic and Vistria's expected gains to be between $291 million and $462 million using an 11% discount rate.[444]

The underwriting projections were prepared in the ordinary course of business and formed the basis for the firms' decisions to invest capital.[445]   They capture the full expected gains from the defendants' buy-and-build strategy, including accretive mergers and acquisitions.[446]

Even so, the projections are both outdated and unreliable.   Nautic's and Vistria's 2021 and 2022 projections forecasted that VitalCaring's EBITDA would increase from approximately $30 million in 2021 to between $46 and $60 million by 2023.[447]   In reality, VitalCaring's EBITDA declined by over 70% from $24.9 million in the fourth quarter of 2021 to $6.8 million in the second quarter of 2023.[448]   This negative performance is in line with a steep decline across the home health and

---

[443] Zenner Rep. ¶ 75; Zenner Tr. 1874-75, 1895-96; JX 3209 at 15; JX 1779 at 15; JX 2034 at 13.

[444] Zenner Tr. 1895-96; Zenner Rep. ¶ 75.

[445] *Id.* at 1878-81.

[446] Zenner Rep. ¶ 56; Zenner Tr. 1920-21, 1925.

[447] *See* JX 2481 ("Dudney Rebuttal Rep.") ¶ 36 fig.7; *see also* JX 3209 at 31; JX 1779 at 15; JX 2034 at 13.

[448] Dudney Rebuttal Rep. ¶ 34 fig.6.

hospice industry precipitated by labor shortages and falling fee-for-service Medicare volumes.[449]

Although this court is uncompromising in its condemnation of disloyalty, it cannot set damages based on "speculation or conjecture."[450] The Nautic and Vistria underwriting projections are not indicative of VitalCaring's performance to date. Even under the broad tenets guiding damages for breaches of the duty of loyalty, the projections provide no reliable basis to make a responsible damages assessment.[451] The defendants cannot disgorge profits that have never materialized.[452]

---

[449] JX 4108 at 3 (identifying fee-for-service reimbursement and clinical labor retention as key risks); Dudney Tr. 2033-34; *see also* JX 2243 at 1 (identifying "persistent headwinds" affecting the home health space in Q4 2022).

[450] *Medek v. Medek*, 2009 WL 2005365, at *12 n. 78 (Del. Ch. July 1, 2009) (quoting *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1958)).

[451] *E.g.*, *Highfields Cap., Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 53 n.55 (Del. Ch. 2007) (observing that an expert's "use of dated management projections . . . undermine[d] his DCF calculations"); *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *17 (Del. Ch. Aug. 18, 2006) (concluding that five-year projections that "did not accurately or reliably track the 'revenue mix' of [the company]" proved "not accurate enough . . . to be considered reliable for future years").

[452] Encompass relies on cases applying the "highest intermediate price" principle to argue that the court ought to resolve uncertainties in its favor. Pls.' Post-trial Opening Br. 95. It does not attempt to calculate the highest intermediate value. Nor could it. Doing so would assume that there was an increase in the value of VitalCaring since completing the Original Acquisitions. There was not.

### 2. Compensatory Damages for Lost Profits

In the alternative, Encompass requests $157 million in "compensatory damages for lost profits."[453] Zenner calculated a present value of $92 to $157 million in gains solely from the Original Acquisitions using an 11% discount rate to Nautic's and Vistria's 2021 and 2022 underwriting projections.[454] Encompass asserts that this remedy is appropriate since, had it pursued the Original Acquisitions, an estimate of its expected returns would have been at least as great as the PE Defendants' projections.[455]

This approach suffers from the same fatal flaw as the disgorgement measure. It is based on unreliable projections anticipating a future that never came to pass.[456] VitalCaring remains profitless.[457] I lack a responsible basis to estimate compensatory damages.

### 3. Constructive Trust over VitalCaring's Future Proceeds

VitalCaring's financial struggles create a remedial quandary. I have found egregious breaches of the duty of loyalty by Anthony, James, and Walker—with

---

[453] Pls.' Post-trial Opening Br. 102.

[454] Zenner Rep. Exs. 12, E.1A-E.1C; Zenner Tr. 1904-05.

[455] *See* Pls.' Post-trial Opening Br. 101-02; Zenner Tr. 1869-70; Zenner Rep. ¶¶ 112-14.

[456] *See* Dudney Tr. 2048-50; Dudney Rebuttal Rep. ¶¶ 24, 30-31, 36 fig.7; *see also* Zenner Tr. 1938.

deep involvement by the PE Defendants.[458]  Yet there is no benefit to be disgorged.

The declining home healthcare and hospice industry is part of the problem.  But what

if the industry rebounds while VitalCaring implements the acquisition strategy

underpinning the PE Defendants' investment thesis?

Vistria and Nautic contemplated multi-year growth through acquisitions and

a profitable exit no fewer than five years later.[459]  They tout successful track records

and have turned sizable profits on their investments—even those that initially

underperformed.[460]  They remain bullish on VitalCaring's prospects.[461]  In fact, they

have begun exploring new acquisition opportunities.[462]  Any future gains through

---

[457] *See Metro Storage*, 275 A.3d at 860 ("Delaware courts regularly refuse to award damages based on the lost profits from a new business, deeming evidence of lost profits to be too speculative, uncertain, and remote when there is no history of prior profits.").

[458] *See supra* Sections II.A-B.

[459] *E.g.*, JX 831 at 7 (forecasting a "strong growth rate . . . through future de novo expansions and through continued M&A activity"); JX 1020 at 15 (highlighting growth opportunities in the home health and home care space accessible through M&A).

[460] *See* Schuppan Tr. 1836-37 (discussing a profitable exit from a Vistria investment once written down); Corey Tr. 1402-04 (confirming Nautic has exited companies once written down at a profit).

[461] *See* JX 3221 at 2-3 (Anthony confirming in 2023 that she does not see an IPO in VitalCaring's future because there are "a lot of opportunities to grow within our current sponsor group" and suggesting that she expected the company to perform well enough to make Nautic and Vistria money); JX 3205 at 2-3 (Schuppan in 2023 stating that the home health industry is a "long-term secular winner[], at least from an investment perspective" and that Vistria planned to remain in the sector "for a long time").

[462] After trial, the defendants submitted several letters to this court about a suit brought by the United States Department of Justice (DOJ) to block a transaction between home

83

the exit of the investment would be, in part, the consequence of disloyalty, aided and abetted by the PE Defendants. It would be inequitable for the defendants (and Anthony) to retain the entirety of such gains simply because this trial occurred before they were realized.

Equity provides a solution: the constructive trust. As explained by *Pomeroy's Equity Jurisprudence*:

> Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient matter, where there is no intention of the parties to create such a relation, and in most cases contrary to the intention of the one holding the legal title, and where there is no express or implied, written or verbal, declaration of the trust.[463]

A constructive trust is "an equitable remedy of great flexibility."[464] The point of the trust is not "to effectuate the presumed intent of the parties, but to redress a wrong"

_____

healthcare firm Amedisys, Inc. and UnitedHealth Group Inc. ("UHG"). That transaction is a condition precedent to VitalCaring's planned acquisition of UHG and Amedisys care centers in various markets. *See* Pls.' Nov. 14, 2024 Letter (Dkt. 517) Ex. A; Defs.' Nov. 13, 2024 Letter (Dkt. 516) Ex. A ¶ 10. If the Amedisys/UHG deal closes, VitalCaring expects to also close on its purchase of the home health assets. *See* Defs.' June 28, 2024 Letter (Dkt. 500). Press releases submitted to the court suggest that despite the DOJ's lawsuit, VitalCaring remains "committed to the long-term growth of the company." *See* Pls.' Nov. 20, 2024 Letter (Dkt. 518) Exs. A-B. Regardless of whether the transactions are completed, these letters show that VitalCaring is actively pursuing M&A.

[463] 4 John Norton Pomeroy, *Pomeroy's Equity Jurisprudence* § 1044 (5th ed. 1941).

[464] *Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993).

where one party is unfairly enriched at the expense of another to whom a duty is owed.[465]

Courts have long relied on the constructive trust as "the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty."[466] Constructive trusts have been impressed on "specific property or identifiable proceeds of specific property," including funds over which a plaintiff claims equitable ownership.[467] They have been ordered where future profits from a fiduciary's disloyalty are too speculative to support an immediately payable award.[468]

---

[465] *Id.* at 652 ("A constructive trust is the formula through which the conscience of equity finds expression." (quoting *Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 380 (N.Y. 1919))); *see also Adams v. Jankouskas*, 452 A.2d 148, 152 (Del. 1982) ("[A] constructive trust . . . is imposed when a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty."); *Snepp v. U.S.*, 444 U.S. 507, 515 (1980) ("A constructive trust . . . is the natural and customary consequence of a breach of trust. It deals fairly with both parties by conforming relief to the dimensions of the wrong.").

[466] *Guth*, 5 A.2d at 510 (citation omitted); *see supra* note 465.

[467] *Hogg*, 622 A.2d at 652; *see also PharmAthene Inc. v. Siga Techs., Inc.*, 2011 WL 4390726, at *34 (Del. Ch. Sept. 22, 2011) ("Although Delaware law requires that the corpus of a constructive trust be specific property, identifiable proceeds of specific property can satisfy that requirement." (citation omitted)), *rev'd in part on other grounds*, 67 A.3d 330 (Del. 2013) (vacating the court's equitable damages award upon reversing its denial of expectation damages for promissory estoppel).

[468] *See PharmAthene*, 2011 WL 4390726, at *37 (awarding equitable interests in a business where the "present value of [defendants'] future profits" was "too uncertain" to support a money damages award); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 55 illus. 4 (Am. L. Inst. 2011), Westlaw (database updated June 2024) (explaining that a constructive trust may be ordered even when "[d]amages from [a fiduciary's] disloyalty would be purely speculative").

A constructive trust is warranted here. Encompass has been wronged by its former fiduciaries and the third parties who aided them. This court must endeavor to "extinguish[] all possibility of profit [and equity] flowing from [the fiduciary's] breach."[469] The trust would furnish Encompass with the "identifiable proceeds of [this] specific property": VitalCaring's future profits.[470] If VitalCaring realizes gains, Encompass will be entitled to a portion of them.

The mechanics of the trust are more complicated.

### a. Capital Contributions

The first issue in forming the constructive trust concerns Nautic's and Vistria's capital contributions to VitalCaring. Estimates of their contributions range from approximately $199.5 million to $263.2 million in the 2021 and 2022 underwriting projections,[471] to $330.1 million in Nautic's June 2023 projections.[472]

One approach would be to permit Nautic and Vistria to retain 100% of every dollar of VitalCaring profits until they have recovered their capital contributions in

---

[469] *Guth*, 5 A.2d at 510.

[470] *See McMahon*, 532 A.2d at 608 (stating that a constructive trust is a "proprietary remedy" upon which the plaintiff can rely "if the defendant still has the property").

[471] Zenner Rep Ex. 8; *see also* Zenner Rep. ¶¶ 71-75; JX 3209 at 14; JX 1779 at 6; JX 2034 at 4-5.

[472] JX 2422 at 1; *see infra* note 494 and accompanying text (describing the June 2023 projections).

full.  At that point, Encompass would receive 100% of every dollar of profits made by VitalCaring until an exit.

Visually represented, the trust would have a horizontal structure:



The defect in this approach is that the PE Defendants would be incentivized only to recover their profits.  They would have no financial motive to generate profits beyond the amount of their capital contributions.  Their assets and effort devoted to VitalCaring might be reallocated to other projects.

Another approach involves sharing future profits between Nautic and Vistria, on the one hand, and Encompass, on the other hand.  In *PharmAthene Inc. v. Siga Technologies, Inc*, Vice Chancellor Parsons ordered an "equitable payment stream" so that the breaching party's future profits would be shared with the plaintiff when received.[473]  He contemplated that the profit sharing would track an agreement the

---

[473] *PharmAthene*, 2011 WL 4390726, *40.

parties would have been amenable to before the breach.[474] The resulting split reflected the parties' negotiated risks and incentives.[475]

A similar approach to the one outlined in *PharmAthene* is apt here. If Nautic and Vistria recover their capital contributions while Encompass receives a fixed portion of the payment stream, risk will be appropriately allocated. Encompass will fairly recover a portion of VitalCaring's profits until the defendants' exit, at which point exit proceeds will be apportioned, and the trust will cease to exist. Nautic and Vistria will remain incentivized to support VitalCaring's growth to recover their investments. If they choose not to grow the business, they do so at their own peril. The remedy of a constructive trust is less concerned with compensating a plaintiff than with removing the rewards of a defendant's disloyalty.[476]

---

[474] *Id.* at *40-42.

[475] *Id.* at *38-40.

[476] *Guth*, 5 A.2d at 511.

The trust will be split vertically rather than horizontally:



b.      Economic Gains to Nautic and Vistria

Having adopted a vertical payment waterfall for the constructive trust, I must next assess Nautic and Vistria's expected gains—that is, the amount they expect to receive above their capital contributions.[477]   This exercise requires projecting VitalCaring's future profits.

The projections should account for M&A beyond the Original Acquisitions. The overarching wrong is the formation of the competing enterprise using Encompass's resources, labor, and confidential information—first as a planned home healthcare venture, then as Topco, and later as VitalCaring.  It is not limited

_____

[477] *See, e.g.*, Zenner Rep. Ex. 9.

to usurping the Original Acquisitions, which were intended to serve as a platform for VitalCaring's roll-up growth strategy.[478]

That leaves the matter of which projections reflecting the Original Acquisitions and subsequent M&A to employ. Encompass believes that the remedy should be based on the underwriting projections. But I find the most recent Nautic projections in the record—from June 2023—to be more reliable. I adopt them after making several adjustments.

i.      *Underwriting Projections*

Encompass relies on the 2021 and 2022 underwriting projections to calculate Nautic and Vistria's expected gains for purposes of forming a constructive trust.[479] There is some logic to using these projections to form a remedy. The projections reflect Nautic and Vistria's expectations at the time of the wrongdoing. They were prepared to pitch the VitalCaring investment to Nautic and Vistria's investment committees. And they include not only projected gains from the Original Acquisitions, but also those from additional acquisitions.[480]

Zenner's analysis uses these underwriting projections. After calculating VitalCaring's equity value as of 2026, he assessed Nautic and Vistria's exit proceeds

[478] *See supra* text accompanying note 102.

[479] *See* Tr. of May 16, 2024 Post-trial Oral Arg. (Dkt. 498) 61-62.

[480] *See infra* note 514; *see also* JX 3209 at 16; JX 2034 at 13; JX 1779 at 15; Zenner Rep. ¶ 68; *id.* at Exs. E.1AE.1C, 9.

as of that time—consistent with a five-year exit.[481] He explained that Nautic and Vistria would not receive all of VitalCaring's equity value for two reasons. One, part of the equity value would be distributed to VitalCaring employees under the MEIP.[482] And two, the equity value would be adjusted based on the ownership stake Nautic and Vistria expected to have upon exit.[483]

Both Nautic's July 2021 investment committee presentation and Vistria's October 2021 investment committee presentation projected that the firms' combined equity stake upon exit would be around 78%.[484] Vistria's May 2022 investment committee presentation projected an 82% stake.[485] Zenner used these projections and the 1% sponsor exit fee to determine total proceeds to Nautic and Vistria for the Original Acquisitions plus additional M&A.[486]

Zenner then discounted Nautic and Vistria's exit proceeds as of 2026 using a 11% discount rate.[487] He explained that Nautic and Vistria's gains as of a set date

---

[481] Zenner Tr. 1876. Schuppan testified that the PE Defendants used a five-year exit as their standard underwriting plan, though in practice they were often flexible in their exit timeline and targeted a 3x return. Schuppan Tr. 1834-35.

[482] Zenner Rep. ¶ 34.

[483] *Id.*

[484] *Id.* at Exs. E.4A nn.1-2, E.4B nn.1-2 (calculating the sponsor share of preferred and common equity in July 2021 and October 2021, respectively); *see also id.* ¶ 34.

[485] *Id.* at Ex. E.4C nn.1-2 (calculating the sponsor share of preferred and common equity in May 2022); *see* Zenner Rep. ¶ 34.

[486] *Id.* at Exs. E.4A-E.4C; Zenner Rep. ¶¶ 36-39.

[487] Zenner Rep. ¶ 40.

are the difference between the present value of their exit proceeds and their capital contributions.[488] He was thus able to calculate the gains to Nautic and Vistria from VitalCaring.[489]

But VitalCaring has never come close to meeting the underwriting projections—due at least in part to headwinds in the home health and hospice market.[490] Though there are signs that the industry may be poised for a resurgence, I cannot responsibly grant a remedy premised on the prospect of an economic turnaround. There is no evidence in the record suggesting that VitalCaring is on track to meet Nautic's and Vistria's 2021 and 2022 projections. Quite the opposite.

The "wrongdoer rule" does not excuse the requirement that the court have a sound basis to estimate damages.[491] The underwriting projections are unreliable. I decline to adopt Zenner's analysis using them.

---

[488] *Id.* ¶ 43.

[489] *See id.* Exs. E.1A-E.1C, 12; Zenner Rep. ¶ 79.

[490] *See* Schuppan Tr. 1638-39, 1643-44; Dudney Tr. 1976-79; Zenner Tr. 1938-39, 1941-42; *see also supra* note 449.

[491] *See NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *25 (Del. Ch. Aug. 2, 2023) (explaining that the "'wrongdoer rule,' which provides that uncertainty in a damages estimate should be construed against the breaching party . . . d[id] not relieve [the plaintiff] of its burden to present [] damages that are not speculative"); *cf. Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1023-24, 1024 n.12 (Del. 2001) (observing that uncertainty regarding future events that are "impossible to know" should not be resolved against the defendant (citing *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 608 (S.D.N.Y. 1977))); *Del. Express*, 2002 WL 31458243, at *15 ("Speculation is an insufficient basis [for damages] . . . .").

## ii.    *Nautic's June 2023 Projections*

Zenner provides an alternative valuation based on Nautic's June 2023 quarterly projections for VitalCaring.[492]  These projections were revised downward from Nautic's underwriting projections to reflect trends in the home health and hospice sector.[493]  Nautic prepared the projections consistent with its regular reporting practice to inform investors of the fund's current invested cost and the fair market value of the investment as of the quarter ending June 30, 2023.[494]

Nautic ran a discounted cash flow (DCF) analysis, in which it discounted unlevered cash flows from 2023 to 2028 using a weighted average cost of capital (WACC) of 19.9%.[495]  It computed the WACC based on the then-current yield on high yield bonds for similar companies (8.5%), a 27% tax rate, projected leverage of 30%, and a 25.7% cost of equity.[496]  Based on these inputs, Nautic estimated VitalCaring's enterprise value to be $267 million and its equity value to be $141 million.[497]

---

[492] Zenner Rep. ¶¶ 84-111 (analyzing and critiquing Nautic's 2023 projections).

[493] *Compare* JX 2422 (Nautic June 2023 Projections) 2, *with* JX 3209 at 32; JX 1779 at 15; JX 2034 at 13.

[494] Corey Tr. 1210-11.  Nautic delivered this information to investors along with commentary on Nautic's position as of the time of projections.  *Id.*

[495] *See* JX 2422 at 2.

[496] *Id.*; Zenner Rep. ¶ 98.  The WACC is equal to (% debt) x (cost of debt) x (1-tax rate) + (% equity) x (cost of equity).  *See* Zenner Rep. Ex. 14.

[497] JX 2422 at 1; Zenner Rep. ¶ 96; *id.* at Ex. 14.

Zenner proposes three adjustments to Nautic's calculations: (1) a lower cost of equity, (2) a higher exit multiple, and (3) additional EBITDA and net debt corresponding to an active M&A pipeline.[498]  I reject his suggested cost of equity reduction but adopt his adjustments accounting for an increased exit multiple and additional M&A.  Based on these adjustments, I arrive at an enterprise value of approximately $408 million and an equity value of approximately $220 million.  I discuss each adjustment below.

Decreasing the Cost of Equity.  Nautic used the "build up" method in calculating the cost of equity, which involves adding an equity risk premium to the risk-free rate, and adjusting for size, industry, and company-specific risks.[499]  Specifically, Nautic used a high rate to "account for the high level of risk associated with the projections in light of [VitalCaring]'s substantial underperformance relative to all prior forecasts."[500]

---

[498] Zenner Rep. ¶¶ 99-101, 105, 107-08.

[499] JX 2422 at 2; Zenner Rep. ¶ 99.

[500] Defs.' Post-trial Br. 86 (emphasis omitted).

Zenner argues that this method of calculating VitalCaring's cost of equity contradicts the basic principles of a capital asset pricing model (CAPM).[501] He argues Nautic should not have included non-systematic company-specific risks or industry-specific risks in its model since these risks could be diversified away.[502]

Zenner's argument would carry more weight if VitalCaring were a public company. In this case, it would be easier to measure the market value of a given stock. A key input in CAPM is a particular company's "beta"—a measurement of a security's volatility relative to the broader market.[503] But a reliable beta requires historical performance data that is unavailable for a private company like VitalCaring.[504] In such circumstances, the build up method employed by Nautic is an accepted valuation technique.[505]

I therefore reject Zenner's proposed adjustment. Instead, I accept the 25.7% cost of equity and 19.9% WACC used in Nautic's original June 2023 valuation.[506]

---

[501] Zenner Rep. ¶ 99.

[502] *Id.*

[503] *Id.* ¶ 66 n.80; *id.* at App. D ¶ B.

[504] *See* Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* 673 (3d. 2012) ("[F]or a private firm . . . the absence of market prices seems to rule out the calculation of either a market beta or a correlation efficient."); *see also Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 518 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010) (noting that the "traditional approach to beta" uses Bloomberg data to "examin[e] the co-variance of a company's stock performance with that of the stock exchange on which the firm's shares are listed"); *Andaloro v. PFPC Worldwide, Inc.*, 2005

<u>Increasing the Exit Multiple</u>. Nautic used a 10.0x EV/LTM EBIDTA exit multiple to calculate terminal value.[507] An EV/LTM EBITDA multiple compares a company's enterprise value (EV) to its EBITDA over the last 12 months (LTM). Nautic's basis for adopting a 10.0x multiple is unclear.

This multiple is materially lower than that used by Nautic and Vistria in prior investment committee presentations from July 2021 to May 2022, which ranged from 14.0x to 15.0x.[508] There were strong pressures on the home health and hospice

---

WL 2045640, at \*15 (Del. Ch. Aug. 19, 2005) ("Because [the defendant] is a private company that does not trade on the public markets, its beta cannot be determined by direct measurement.").

[505] *See, e.g.*, Damodaran, *supra* note 504, at 674 (listing "[b]uild up approach" under the heading "Alternative Adjustments for Private Firm Risk"); Shannon P. Pratt & ASA Educational Foundation, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 209 (6th ed. 2021) ("The two most commonly applied methods for estimating the [equity discount rate] are: [the] capital asset pricing model (CAPM) [and the] build up method.") (citation omitted); *see also Delaware Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 338 (Del. Ch. 2006) (observing that in the context of "small, non-public company," the build up model is "the proxy that has found the most favor among professional appraisers"); *but see Hintmann v. Fred Weber, Inc.*, 1998 WL 83052, at \*4 (Del. Ch. Feb. 17, 1998) (rejecting use of the build up method in favor of CAPM and describing the use of the median beta of comparable companies as "the customary method of determining a beta for a privately held company").

[506] *See* JX 2422.

[507] *See id.* at 2; Zenner Rep. ¶¶ 102, 105. The calculation of terminal value is standard practice in a DCF analysis, which typically involves projecting future cash flows for a short period into the future (often five years), and then applying an exit multiple to determine cash flows thereafter. *See* Pratt *supra* note 505, at 169; *see also* Zenner Rep. ¶ 59 n.71 (citing Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions* 232 (2009)).

[508] *See* JX 3209 at 32 (using a 14.0x exit multiple); JX 1779 at 15 (using a 14.5x exit multiple); JX 2034 at 13 (using a 15.0x exit multiple).

sector that led to a downturn in market valuations.[509]  But the defendants' expert, Louis G. Dudney, noted that comparable companies were trading at an average multiple of 14.5x as recently as September 2023.[510]

On this logic, I agree with Zenner's adoption of a higher exit multiple and adopt a 14.5x exit multiple for my analysis.  This multiple is consistent with Dudney's suggested multiple based on data of publicly traded competitors.[511]  It is also the midpoint of Zenner's suggested range and in line with multiples employed in more recent investment committee presentations by the PE Defendants.[512]

---

[509] *See supra* note 216 and accompanying text.

[510] Dudney Rebuttal Rep. ¶ 78 fig.19.  Zenner and Dudney dispute the correct computation of the exit multiple using comparable companies, with Zenner calculating a higher industry average.  *Compare id.*, *with* Zenner Rep. Ex. 4.  There are several key differences between the metrics used by the experts.  First, although they use largely the same company set, Dudney includes one additional company omitted from Zenner's set (The Pennant Group, Inc.), which trades at the lower end of the range (12.6x in September 2023).  *Id.* Additionally, Zenner's multiples are computed using several quarters, whereas Dudney's use a single point in time.  *Id.*  Finally, there appear to be data discrepancies, with some of the same companies trading at different multiples in two reports for the period ending June 30, 2023 (Q2 2023).  *Id.*  I need not resolve which expert's report is more accurate, however.  Zenner lists the median exit multiple of comparable companies only for reference and uses a multiple closer to Dudney's for his analysis.  *See* Zenner Rep. ¶ 61 ("While I adopt the 14.0x to 15.0x range of exit multiples from the Nautic and Vistria presentations for purposes of my analysis, I note that this range of multiples is lower than what market evidence suggests.").

[511] Dudney Rebuttal Rep. ¶ 78 fig.19.

[512] Zenner Rep. ¶ 61 (adopting an exit multiple range of 14.0x to 15.0x); *id.* ¶ 104 n.123 (showing that five-year exit multiples for valuations performed by Nautic and Vistria between July 2021 and December 2022 range from 14.0x-15.0x).

Future M&A.  Nautic's June 2023 projections exclude M&A beyond the Original Acquisitions.[513]  This omission is inconsistent with the record and VitalCaring's own recent actions and statements.[514]  To correct for this flaw, Zenner reinstates Nautic's and Vistria's projections from their July and October 2021 investment committee presentations, respectively.[515]  He projects hypothetical "gains" to Nautic, Vistria, and Anthony resulting from these potential acquisitions.[516]

In rebuttal, Dudney points out several flaws with Zenner's assumption that VitalCaring will make acquisitions as projected in 2021 despite the downward adjustments to Nautic's June 2023 projections.  He argues that "as a result of the underperformance of [VitalCaring], the company does not have the excess free cash flow previously projected to be used to fund add-on acquisitions."[517]  He also notes the higher borrowing costs—both in the market generally and for VitalCaring due to its poor performance—"may hinder any projected debt financing" of future

---

[513] JX 2422 at 2 (projecting the profit and loss for the "core business" only).

[514] Zenner Rep. ¶ 93; Corey Dep. 35-36, 42-43; *see also supra* note 462 and accompanying text; *supra* note 219 and accompanying text (discussing VitalCaring's reference to expanding nationwide on its website).

[515] Zenner Rep. Ex. 15.

[516] *Id.* at Exs. 16.a-b.

[517] Dudney Rebuttal Rep. ¶ 58.

acquisitions.[518] Dudney further observes that VitalCaring's actual acquisitions in 2022 and 2023 significantly trailed initial forecasts.[519]

Both experts have a point. VitalCaring's financial performance has fallen short of Nautic's and Vistria's 2021 expectations.[520] It cannot fairly be assumed that VitalCaring's acquisitions will meet the originally projected rate. At the same time, VitalCaring's business model relies on a roll-up strategy: some acquisitions (albeit fewer than expected) were in fact made in 2022 and 2023, and more are planned.[521] As such, additional acquisitions should not be excluded from the model.

To balance these realities, I take an approach that considers the actual, reduced rate of acquisitions and Nautic's and Vistria's initial acquisition assumptions. Although the underwriting projections Nautic and Vistria each prepared diverge overall, they share two common assumptions: a compound annual growth rate (CAGR) of 52.2% for future EBITDA growth and net debt from acquisitions equal to 7.5x projected EBITDA.[522] These common assumptions, applied to the actual

---

[518] *Id.* ¶ 58.

[519] *Id.* ¶ 56.

[520] *See supra* notes 215, 447-48.

[521] Dudney Rebuttal Rep. fig.14; *see supra* note 462.

[522] *See* Zenner Rep. Ex. 15 (citing JX 3209 at 31; JX 1779 at 13). Zenner arrived at his M&A projections by subtracting projected EBITDA and net debt without acquisitions from projected EBITDA and net debt with acquisitions. *Id.* The CAGR was computed as follows for Nautic: ($40,800,000 / $5,000,000)$^{1/5}$ - 1 = 0.522. For Vistria, the calculation

acquisition volumes of $1.5 million in EBIDTA for 2022 and $1.0 million for 2023,[523] provide a sound basis to project EBITDA and net debt from acquisitions for 2024 through 2028.

This approach includes future M&A, but at a more realistic capacity than Zenner projected. Under these assumptions, the maximum EBITDA from acquisitions in 2028 is approximately $8.2 million.[524] This figure is more sensible than $40.8 million and $81.6 million projected for 2026 by Nautic's July 2021 and Vistria's October 2021 investment committee presentations.[525] Carried through to the end of 2028, VitalCaring will have incurred $61.3 million in net debt from M&A beyond the Original Acquisitions.[526]

In short, I rely primarily on projections that capture Nautic's financial outlook as of 2023 with certain modifications. I maintain Nautic's cost of equity input of 25.7% but account for hypothetical add-on acquisitions and use a greater EBITDA exit multiple as Zenner suggests.[527] And I take a more conservative approach to add-

---

is ($81,655,000 / $10,000,000)$^{1/5}$ - 1 = 0.522. For both Nautic and Vistria, I calculated the 7.5 average net debt to EBITDA ratio for the years 2023 to 2028 based on Zenner's computations and then averaging it across this five-year time span.

[523] Dudney Rebuttal Rep. fig.14.

[524] For 2023, Nautic had actual EBITDA from M&A of $1.0 million. Dudney Rebuttal Rep. ¶ 56 fig.14. $1.000 million x $(1.522)^5$ = $8.167 million.

[525] *See* Zenner Rep. Ex. 15 (citing JX 3209 at 31; JX 1779 at 13).

[526] $8,167,201 x 7.5 = $61,254,010; *see supra* note 523 and accompanying text.

[527] *See supra* note 507-16 and accompanying text.

on acquisition volume relative to Zenner's estimates to conform to 2022 and 2023 actuals.[528]

Adding the EBITDA from acquisitions and adjusting the exit multiple to 14.5x yields total cash flows of $925,768,258.[529] An enterprise value of $407,837,158 results from discounting these total cash flows using a 19.9% WACC (corresponding to a 25.7% cost of equity).[530] Subtracting the net debt in Nautic's June 2023 projections ($126,141,000)[531] from this enterprise value and additional

---

[528] *See supra* note 520-26 and accompanying text.

[529] I rely on the back-up native Excel to Zenner's report. *See* Dkt. 515. There, his analysis pulls from a replicated version of the DCF Nautic used for its 2023 projections. *Compare* Dkt. 515 ("DCF Back-up" tab), *with* JX 2422 at 2. To compute the total cash flows, I use the same EBITDA projected by Nautic as a base, adding only EBITDA from M&A projected in 2023 using a 52.2% CAGR. I also calculate a different terminal value than Nautic since I apply a 14.5x exit multiple. This yields a terminal EBITDA of $768,256,419 ($52,983.201 EBITDA for 2028E x 14.5) rather than $448,160,000 ($44,816,000 for 2028E x 10.0x). Other than EBITDA, I generally replicate Nautic's projections—with one exception. Nautic seemingly intended to calculate taxes by applying a 27% tax rate to pre-tax earnings (calculated by adding back depreciation and amortization as well as changes in working capital). But its formula pulls from a blank row, which seems to be an error.

[530] I apply the same methodology Nautic used in its 2023 projections in discounting projected cash flows using the WACC.

[531] *See* JX 2422 at 1 ($140,000,000 - $13,859,000 = $126,141,000).

net debt from M&A ($61,254,010)[532] results in a total equity value of $220,442,148.[533]

### c. Allocation of Payment Streams

The next step is to allocate VitalCaring's proceeds between Nautic and Vistria, on the one hand, and Encompass, on the other hand, by way of a vertical payment waterfall.

Zenner calculates a relative distribution by dividing the present value of Nautic and Vistria's target exit proceeds from their expected gains.[534] His analysis suggests that Encompass's share should be between 56% and 70% based on the 2021 and 2022 underwriting projections.[535]

Zenner's approach presumes that both the target exit proceeds and expected gains are positive. But applied to Nautic's 2023 projections as modified, it would yield negative economic gains for Nautic and Vistria. That is because they have

---

[532] *See supra* note 526.

[533] $407,837,158 - $126,141,100 - $61,254,010 = $220,442.148.

[534] Zenner Tr. 1897-99.

[535] Per Zenner's computations, Nautic and Vistria's share is 59% using Nautic's July 2021 projections ($290,727,855 / $494,127,855), 70% using Vistria's October 2021 projections ($461,588,274 / $661,074,274), and 56% using Vistria's May 2022 projections ($336,880,267 / $600,049,153). *See* Zenner Tr. 1897-99; Zenner Rep. Exs. E.1A-E.1C; *see also* Zenner Rep. E-15 (explaining computations).

102

contributed more capital than the modified 2023 projections suggest they might recover.

The following table presents my calculations using the modified 2023 projections compared to Zenner's calculations using Nautic's July 2021 projections:[536]

---

[536] Numbers in the "2021 Projections" column are from Zenner's report. Zenner Rep. Ex. E.1A. Numbers in the "Modified 2023 Projections" column are based on Nautic's June 2023 projections, with certain modifications. Like the 2021 numbers, the 2023 numbers are based on projections over five years, after which point an exit multiple is applied to calculate a terminal value. *See supra* note 507 (describing the calculation of terminal value). The 2023 numbers in this table assume a 2028 exit; the 2021 numbers assume a 2026 exit.

| (all $ in millions) | Modified 2023 Projections | 2021 Projections |
|---|---|---|
| Projected EBITDA at Exit | $53.0 | $108.3 |
| Exit Multiple | 14.5x | 14.0x |
| Enterprise Value at Exit[537] | $768.3 | $1,516.8 |
| Net Debt Balance at Exit | $187.4 | $269.7 |
| Equity Value at Exit | $580.9 | $1,247.1 |
| Nautic & Vistria Proceeds[538] | $460.2 | $870.9 |
| Discount Rate | 25.7% | 11.0% |
| **Present Value of Nautic & Vistria Proceeds[539]** | **$131.0** | **$494.1** |
| Nautic & Vistria Contributions | $330.1[540] | $203.4[541] |
| **Economic Gains to Nautic & Vistria** | **($199.0)** | **$290.7** |

[537] This number was calculated by multiplying the EBITDA projected at exit by the exit multiple. It represents VitalCaring's enterprise value at time of exit, i.e., in 2028 for the 2023 projections.

[538] Zenner presumed that Nautic and Vistria would receive proceeds equal to 78% of total equity value. *See supra* note 484 and accompanying text; Zenner Rep. Ex. E.4A. Additionally, Zenner's calculations include an exit fee equal to 1.22% of the total equity value at exit ($15,200,000 / $1,247,100,000), drawn from Nautic's July 2021 presentation. *See* JX 3209 at 32; Zenner Rep. Ex. E.6. This compares closely to the 1.29% exit fee used in Vistria's October 2021 presentation ($21,438,000 / $1,657,888,000) and Vistria's May 2022 presentation ($17,132,000 / $1,329,347,000). *See* Zenner Rep. Ex. 6; *see also* JX 1779 at 15; JX 3209 at 12. To maximize consistency with Zenner's calculations, I also applied a 78% overall share of equity proceeds and a 1.22% exit fee.

[539] Zenner discounted Nautic and Vistria's proceeds by the number of days between the last day of the year in 2026 and the release of the projections on July 26, 2021. That is, the present value was computed as $870.9 / $(1+0.11)^{5.43}$. *See* Zenner Rep. Ex. 9. Using this same methodology, Nautic and Vistria's proceeds are discounted from December 31, 2028 back to July 4, 2023—the last date in the record on which Nautic recorded its 2023 proceeds. *See* JX 2422 at 1 (reflecting a "[l]ast [s]aved" date of July 4, 2023). That calculation is: $460.2 / $(1+0.257)^{5.49}$.

[540] *See* JX 2422 at 1.

[541] *See* Zenner Rep. Ex. 8.

A rote application of Zenner's methodology to the modified 2023 projections thus yields an absurd mathematical result.[542]

Zenner's comparison of Nautic and Vistria's economic gains to the present value of their expected proceeds is one way to measure an equitable distribution. But it is not the only way.

Another way to conceptualize the allocation percentage is as Nautic and Vistria's rate of recovery, or how much upon exit they could recover on each dollar they contributed to the enterprise. This approach compares Nautic and Vistria's capital contributions to VitalCaring's total projected equity value at exit. By this measurement, Nautic and Vistria would be entitled to recover 57% percent of every dollar of VitalCaring profits.[543]

There is merit to this alternative approach. First, it provides an intuitive proxy for the total equity value attributable to Nautic's and Vistria's investments. Second, it produces a rational result that allocates risks and rewards. With a 57% share, Nautic and Vistria can recover their capital contributions and remain incentivized to grow the business. A sizable 43% portion of the proceeds will flow to Encompass due to the willful misconduct that produced VitalCaring.

---

[542] It bears noting that Nautic and Vistria's expected economic gains are negative here due to the significant declines in performance projected by Nautic. Adding back projected

105

This resulting trust will take the following vertical structure:



\*                \*                \*

This court has a responsibility to "put in place a balanced remedy that is equitable and reasonably tailored to address the precise nature of the misconduct at issue."[544]  Here, the remedy must balance the equities with the hazards of creating incentive misalignment.  The solution is the formation of a constructive trust.  It

M&A and increasing the exit multiple as described above increase the expected gains to Nautic and Vistria.

[543] $330,058,048 capital contribution / $580,861,409 projected equity value at exit = 57%. *See* JX 2422 at 1; *supra* notes 536-42 and accompanying text.  This result differs from Zenner's allocation in an obvious way: at a lower (and more accurate) valuation, Nautic and Vistria's contributions make up a larger percentage of the total value at exit, i.e., there is less value to disgorge to plaintiffs.

[544] *Agilent Techs. v. Kirkland*, 2010 WL 610725, at \*25 (Del. Ch. Feb. 18, 2010).

disgorges much of the defendants' ill-gotten gains while preserving incentives to service their investment.

Encompass is entitled to a quarterly payment from the constructive trust, assuming the defendants realize profits on their investment.

A downside to this remedy is that it requires ongoing monitoring. A trustee will be appointed to supervise and guide its execution. The trustee will have the power to request information from VitalCaring, its principals, and the PE Defendants to assess the total allocation Encompass is entitled to in a given period. The defendants must provide quarterly financial updates on VitalCaring to the trustee. The trustee may determine, in his or her discretion, to request a modification to the trust based on information received from VitalCaring. The trustee will also provide regular updates to the court.

## B. Mitigation Damages

Encompass claims that it is entitled to two forms of mitigation damages.[545] First, it requests costs incurred from retention packages intended to prevent key employees from defecting to VitalCaring.[546] Second, it seeks attorneys' fees and

---

[545] *Cf. Paron Cap. Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *8 (Del. Ch. May 22, 2012) (awarding "legal fees, expert costs, and other costs to mitigate the damage inflicted by [the defendants'] fraud"), *aff'd*, 62 A.3d 1223 (Del. 2013) (TABLE); *Paradee v. Paradee*, 2010 WL 3959604, at *16 (Del. Ch. Oct. 5, 2010) (concluding that the defendant "must bear the cost of remedying her breaches of fiduciary duty as an element of damages").

[546] Pls.' Post-trial Opening Br. 105-06.

costs from the Texas litigation against Anthony for breaching the restrictive covenants in her employment agreement.[547] I award the former but not the latter.

### 1. Retention Packages

In October 2021, Encompass paid retention packages to ten employees. Although the packages were awarded a few months after Anthony left Encompass, they were prompted by her actions while she remained an Encompass fiduciary.[548] Anthony targeted several members of Encompass's management team in early 2021 with the lure of Topco equity.[549] But she did not expect them all to leave immediately. In June 2021, she directed Jolley to postpone her resignation from Encompass because her "lawyers were nervous" that an exodus would set off alarm bells "from a legal standpoint."[550]

---

[547] *Id.* at 107-08.

[548] Jacobsmeyer Tr. 52-54; *see also* JX 1928 at 2 (stating that the packages were awarded "[t]o enable the Company to rapidly respond to aggressive recruitment actions from home health and hospice competitors"); JX 4077 (requesting permission from the Compensation and Human Capital Committee to issue the bonuses in order to "rapidly respond to aggressive recruitment actions from home health and hospice competitors"); JX 4078 (sending "a list of key people that are being sought after by [] competitors" for potential retention bonuses). Although the defendants maintain that "Encompass implemented the retention packages to forestall 'recruitment by competitors' and 'other firms' generally, not Anthony," there is no evidence of solicitation by other companies. Defs.' Post-trial Br. 99.

[549] Jacobsmeyer Tr. 40-41, 47; Jolley Tr. 194-97; *see also supra* note 141.

[550] Jolley Tr. 181-82.

Upon Jolley coming forward in October, Jacobsmeyer prepared a list of ten awardees.[551] Several of the listed employees were ones Anthony had told Jolley she planned to recruit.[552] The awards were granted to these ten employees shortly after Tarr's approval.[553]

These retention awards were issued because of Anthony's disloyal acts, aided by the PE Defendants. Jacobsmeyer credibly testified that she would not have issued the awards absent Anthony's scheme.[554] Encompass is entitled to the fair value of the restricted stock awards and increased management compensation as damages, totaling $1,400,353.92 in restricted stock awards and $221,092.49 in increased compensation.[555]

---

[551] Jacobsmeyer Tr. 52.

[552] *See* Jolley Tr. 139-40, 142-43, 199-200.

[553] *See* JX 3183; JX 1642.

[554] Jacobsmeyer Tr. 52. Jacobsmeyer was also concerned that Encompass was about to begin a strategic review and needed to know who was committed to staying with Encompass before sensitive information was distributed. *See* JX4077 (noting as a rationale for issuing the awards that "[a]s [EHC] continue[s] [its] strategic review, several of [its] employees [were] persistently being approached by other firms"); *see also id.* at 104-06.

[555] *See* JX 4012 at 3-4 (computing the total restricted stock award of $1,400,353.92 and an annual aggregate salary increase for all employees of $387,127.00). The value of the restricted stock awards was determined as of the closing price of the common stock as of the grant date. *See* JX 2296 at 124. As for the salary increases, Encompass seeks to recover the prorated portion of the annual salaries paid before the spin-off on July 1 to account for the plausibility that some employees might have received a similar increase after the spin-off. Pls.' Post-trial Opening Br. 106 n.141. In calculating the prorated salary, Encompass reduced the aggregate salary figure by EHC's 2022 effective tax rate

## 2. Texas Litigation Fees and Costs

Encompass contends that the Texas litigation against Anthony was also precipitated by breaches of fiduciary duty in soliciting Encompass employees. These litigation expenses relate to violations of Anthony's restrictive covenants, which arose from the same facts here. As Encompass sees it, they are entitled to over $11 million in attorneys' fees because the fees were a direct and foreseeable consequence of the defendants' wrongdoing.[556]

Their position has merit on its face. But the Texas court determined that each party in that matter had to bear its own fees and costs consistent with Texas law.[557] To award fees here would be an end-run around the judgment of a sister court. I decline to effectively overrule the Texas court and risk running afoul of applicable Texas law.

---

(22.2%). *Id.*; JX 2296 at 126 (providing the 2022 effective tax rate). The defendants assert that any damages should be reduced because Encompass obtained restrictive covenants in exchange for the awards. Defs.' Post-trial Br. 99-100. But there is no evidence that the covenants were broader than necessary to counter Anthony and the defendants' misconduct. *Cf. BTG Int'l Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *19-20 (Del. Ch. Sept. 19, 2017), *aff'd*, 188 A.3d 824 (Del. 2018) (rejecting damages offsets where the defendant proffered no evidence supporting them).

[556] Pls.' Post-trial Opening Br. 107; *see also Paron*, 2012 WL 2045857, at *8-9 (citing Restatement (Second) of Torts § 914 (Am. L. Inst. 1979)).

[557] JX 4008 at 3. Moreover, under the Texas Not-to-Compete Act, employers may not recover attorneys' fees when seeking to enforce a non-compete provision that is "so overly restrictive that it require[d] reformation." *Franlink, Inc. v. GJMS Unlimited, Inc.*, 401 S.W.3d 705, 712 (Tex. App. 2013). The Texas court concluded that the non-compete and non-solicitation provisions of Anthony's EHC employment agreement were "unreasonably broad and thus unenforceable." JX 4008 at 2-3. It reformed them to be less restrictive. *Id.*

## C. Attorneys' Fees in This Litigation

The American Rule, which Delaware follows, presumes that "each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation."[558] Delaware courts grant exceptions to the rule cautiously.[559]

One exception involves bad faith. "There is no single standard of bad faith that justifies an award of attorneys' fees—whether a party's conduct warrants fee shifting under the bad faith exception is a fact-intensive inquiry."[560] Fee shifting under the bad faith exception may be appropriate "if a prevailing party demonstrates that the losing defendants: i) engaged in bad faith conduct that increased the costs of the litigation; or ii) engaged in pre-litigation conduct of a sufficiently egregious nature."[561]

---

[558] *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 545 (Del. 1998).

[559] *Weinberger*, 517 A.2d at 654 (observing that Delaware courts "have been very cautious in granting exceptions" to the American Rule).

[560] *Auriga Cap. Corp. v. Gatz Props., LLC*, 40 A.3d 839, 880-81 (Del. Ch. 2012).

[561] *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 124 (Del. Ch. 1999); *see also Arbitrium (Cayman Is.) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997) (recognizing that one exception to the American Rule is "cases where the underlying (pre-litigation) conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages"), *aff'd*, 720 A.2d 542 (Del. 1998); *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *31 (Del. Ch. Mar. 13, 2000) (concluding that the "high level of egregiousness" in "aiding and abetting the breach of fiduciary duty . . . justif[ied] an award of attorney and expert witness fees").

The defendants' pre-litigation conduct was nothing short of egregious. They willfully promoted breaches of the duty of loyalty by high-level Encompass officers.[562] They did so in direct contravention of legal advice from Ropes.

Their purposeful efforts to conceal these improper acts made matters worse.[563] The defendants falsified records. They deleted evidence. They used a fake recruiting process. And they manipulated communications through lawyers. These actions warrant fee shifting under the bad faith exception to the American Rule.[564]

This court's "discretion is broad in fixing the amount of attorneys' fees to be awarded."[565] The pervasive bad-faith conduct here—coupled with the risk that damages prove limited—support treating Encompass's fees as an element of its

---

[562] *See supra* Section II.B.

[563] *See Johnston*, 720 A.2d at 546 ("[C]ourts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims.").

[564] *See Cantor*, 2000 WL 307370, at *31 (shifting fees under the bad faith exception for, among other things, "aiding and abetting the breach of fiduciary duty and tortious interference with contract").

[565] *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005).

damages.[566]  Encompass is asked to submit a Rule 88 affidavit to the extent that the

parties cannot agree on the reasonableness of its attorneys' fees.[567]

### D.     Pre- and Post-Judgment Interest

Encompass requests an award of pre- and post-judgment interest.[568]  It is

entitled to both at the legal rate.[569]  Interest will accrue on the mitigation damages

awarded above.  Regarding any damages paid from the constructive trust, the parties

are to confer on whether and how the equitable payment stream should account for

interest.

---

[566] *See In re Nine Sys. Corp. S'holders Litig.*, 2015 WL 2265669, at *2-3 (Del. Ch. May 7, 2015) ("In awarding fees, whether as a proxy for unquantifiable damages or as a traditional fee award, Delaware courts have considered a need 'to discourage outright acts of disloyalty' and to avoid penalizing plaintiffs 'for bringing a successful claim against the [defendants] for breach of their fiduciary duty of loyalty.'" (quoting *William Penn P'ship v. Saliba*, 13 A.3d 749, 759 (Del. 2011))).

[567] *See* Ct. Ch. R. 88.

[568] PTO ¶ 99.i.

[569] *Lamourine v. Mazda Motor of Am., Inc.*, 979 A.2d 1111 (Del. 2009) (TABLE) (providing that "under Delaware case law, pre-judgment interest is a matter of right"); *Moskowitz v. Mayor and Council of Wilmington*, 391 A.2d 209, 210 (Del.1978) ("Interest is awarded in Delaware as a matter of right . . . the plaintiff is entitled to recover interest . . . for a period preceding the entry of judgment."); *Murphy Marine Servs. of DE, Inc. v. GT USA Wilmington, LLC*, 2022 WL 4296495, at *24 (Del. Ch. Sept. 19, 2022) ("The Court of Chancery generally looks to the legal rate of interest, as set forth in 6 *Del. C.* § 2301, as the 'benchmark' for the appropriate rate of pre- and post-judgment interest." (quoting *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988))).

## IV. CONCLUSION

Judgment on Counts I, II, and III is entered for the plaintiffs as set forth above. Counts V and VI are moot.

Within 30 days, the parties must submit a letter listing the names of three mutually agreed-upon potential trustees. The parties are also to confer on and file a proposed form of order outlining the formation of a constructive trust, the function of the trust, and the role and authority of the trustee—consistent with this decision. If the parties cannot agree on a form of order, they may file separate proposed orders with a redline comparing them and a joint letter explaining the differences.

After an order appointing a trustee and forming the constructive trust is entered, the parties are asked to confer on and file a form of final order.

114